636 A.2d 1173

**COMMONWEALTH of Pennsylvania,**

v.

**Melvin SWERDLOW, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 10, 1993.

Filed Feb. 4, 1994.

454

John M. Belli, Philadelphia, for appellant.

Kathy L. Echternach, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before WIEAND, OLSZEWSKI and POPOVICH, JJ.

WIEAND, Judge:

Melvin Swerdlow was tried non-jury and was found guilty of theft by receiving stolen property, criminal trespass and criminal conspiracy in connection with the January 4, 1991, burglary of two homes located at 7643 and 7645 Overbrook Avenue in Philadelphia. Following the denial of post-trial motions, Swerdlow was sentenced to serve concurrent four (4) year terms of probation on his convictions for criminal trespass and conspiracy. Sentence was suspended on his conviction for theft by receiving stolen property. On direct appeal from the judgment of sentence, Swerdlow argues that the evidence presented at his trial was insufficient to sustain the trial court's findings of guilt. After careful review, we are con-

strained to agree; and, therefore, we reverse the judgment of sentence and order that appellant be discharged.

The trial judge, in her post-trial opinion, summarized the evidence from appellant's trial as follows:

At approximately 11:30 on the morning of January 4, 1991, Haverford Township Investigators Daniel Wallower and William Walker went to 7641 Overbrook Avenue in the city of Philadelphia to execute a warrant for the arrest of Martin Gruschin, a co-defendant in this case. Upon arriving at that address, the Inspectors heard a burglar alarm sounding two doors away at 7645 Overbrook Avenue. A woman then pulled up in a car and identified herself as a relative of Annette Bruno, the owner of 7645 Overbrook Avenue. As the Inspectors spoke to the woman, Inspector Wallower noticed the defendant, Melvin Swerdlow, open the front door of his house at 7641 and waive [sic] to the Inspectors. The Inspectors had previously met the defendant as they attempted to locate the co-defendant Martin Gruschin.

The Inspectors then drove around the corner to the alley behind 7645 Overbrook Avenue. There they noticed Mr. Gruschin walking away from 7645 Overbrook Avenue and toward the City Line Shopping Center, which is located just behind the houses on the 7600 block of Overbrook Avenue. Inspector Wallower exited the car and followed Mr. Gruschin into a Thrift Drugs drug store. Inside the store, Inspector Wallower observed Mr. Gruschin standing in a check-out line. Inspector Wallower came up behind Mr. Gruschin and escorted him to an empty check-out counter a few feet away. The Inspector then identified himself and informed Gruschin that he was under arrest. Coins, cash, and jewelry began "fly[ing] out of the defendant's hands" as he was arrested and lead [sic] outside. These items were recovered by a Thrift Drugs store employee who immediately turned them over to the inspectors. The jewelry recovered from Gruschin consisted of six rings which were later identified as having been stolen from the residence at 7643 Overbrook Avenue.

Since the suspected burglary occurred within the city of Philadelphia, the Inspectors notified the Philadelphia Police Department and the West Detectives [Division]. Detective Joseph W. Capone and other detectives of the Philadelphia Police Department's Narcotics Forfeiture Unit were assigned to investigate the case. They arrived at the 7600 block of Overbrook Avenue while Gruschin was still in custody at the scene.

When the Philadelphia Police arrived at the scene, co-defendant Gruschin led them and the Haverford Township Inspectors to a garage located at the rear of 7643 Overbrook Avenue. A panel had been kicked out of the garage door. [The owner of 7643 Overbrook Avenue, Ms. Margo Kinno, knew the defendant Melvin Swerdlow to be her next door neighbor, but she had never given him permission to use her garage.] Inside the garage Inspector Wallower found a pillowcase containing jewelry, a small television, a telephone answering machine, a flashlight and articles of clothing. These items were confiscated by the Haverford Township police, turned over to West Detectives [Division], and later returned to their owners.

On the afternoon of January 4, 1991, Annette Bruno, the owner of 7645 Overbrook Avenue, filed a formal report of the burglary of her residence. An initial investigation by the Philadelphia Detectives failed to reveal the manner in which the co-defendant Gruschin and the defendant Melvin S[w]erdlow gained entry into Annette Bruno's house. On January 8, 1991, Detective Capone returned to the house to inspect for signs of entry. Detective Capone observed that all the usual means of entry—doors, windows, skylight—were secure. He then went to the front bedroom on the second floor, where he discovered that a ceiling panel had been removed from a closet ceiling. Further investigation revealed a 24 inch high crawl space above the bedroom ceiling and a hole in the party wall between the houses at 7645 Overbrook Avenue and 7643 Overbrook Avenue—the party wall between 7645 Overbrook Avenue and 7647 Overbrook Avenue was intact.

Detective Capone then went to 7643 Overbrook Avenue, which is the residence of Ms. Margo Kinno. The detective told her that he was investigating a burglary of 7645 Overbrook Avenue, and that it appeared that someone had gained entry to the residence through the crawl space above her front, second floor bedroom. Ms. Kinno then gave Detective Capone permission to inspect the crawl space. This inspection revealed a break in the party wall between Ms. Kinno's residence and the Swerdlow residence at 7641 Overbrook Avenue. [Ms. Kinno testified at trial that it would cost her $600.00 to repair the break in her party wall.]

Detective Capone then asked Ms. Kinno if she had noticed anything missing from her house. At first she said that she had not, but after looking around, she discovered that some of her rings were missing. At trial, Ms. Kinno testified that on the day of co-defendant Martin Gruschin's arrest, January 4, 1991, she locked her front door and left for work at approximately 7:30 a.m. (the rear door had been nailed shut some time before) and that there were no signs of forced entry when she returned home at about 4:00 p.m.

Detective Capone left Ms. Kinno's residence and went to the Swerdlow house at 7641 Overbrook Avenue. There the Detective had a conversation with the defendant Melvin Swerdlow and the defendant's mother. During the course of this conversation, the Detective asked the defendant if he recalled anything about January 4, 1991, the day of the burglaries. The defendant responded that he remembered talking to the Haverford Township Inspectors outside his house. Detective Capone then asked the defendant's mother if he could inspect her second floor, front bedroom, which he then did.

Trial Court Opinion at pp. 1–5 (footnotes incorporated into text).

Based upon these facts the trial court concluded that appellant and Martin Gruschin had conspired to use appellant's house to break into crawl spaces above neighboring homes and thus gain entrance to such homes so that Gruschin could then

steal jewelry and other property therefrom. With respect to appellant's participation in this conspiracy, the trial court reasoned as follows:

That the defendant Melvin Swerdlow was involved in breaking through the party walls is evidenced, in part, by the fact that he resided in the Swerdlow residence, and thus had the opportunity to break through to the adjacent houses. Second, further evidence of a conspiracy is supplied by this court's finding that the defendant engaged in the commission of the Bruno burglary by acting as lookout and attempting to distract the Haverford Township Investigators as co-defendant Gruschin attempted to flea [sic]. This finding is based on the fact that as Annette Bruno's burglar alarm sounded, the defendant opened his front door and attempted to distract the Investigators by waving to them as Gruschin fled through the rear alley way.

Trial Court Opinion at pp. 6–7.

■ In evaluating a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the Commonwealth, which has won the verdict, and draw all reasonable inferences in its favor. We then determine whether the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. *Commonwealth v. Smith*, 523 Pa. 577, 581, 568 A.2d 600, 602 (1989); *Commonwealth v. Aulisio*, 514 Pa. 84, 91, 522 A.2d 1075, 1079 (1987). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990). The facts and circumstances established by the Commonwealth "need not be absolutely incompatible with [the] defendant's innocence, but the question of any doubt is for the [factfinder] unless the evidence 'be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.'" *Commonwealth v. Sullivan*, 472 Pa. 129, 150, 371 A.2d 468, 478 (1977),

quoting *Commonwealth v. Libonati*, 346 Pa. 504, 508, 31 A.2d 95, 97 (1943). However, even though "reasonable inferences must be drawn in the Commonwealth's favor, the inferences must flow from facts and circumstances proven in the record, and must be of 'such volume and quality as to overcome the presumption of innocence and satisfy the [factfinder] of the accused's guilt beyond a reasonable doubt.'" *Commonwealth v. Scott*, 409 Pa.Super. 313, 315, 597 A.2d 1220, 1221 (1991), quoting *Commonwealth v. Clinton*, 391 Pa. 212, 219, 137 A.2d 463, 466 (1958). "The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fall even under the limited scrutiny of appellate review." *Commonwealth v. Scott, supra.* See: *Commonwealth v. Fields*, 460 Pa. 316, 333 A.2d 745 (1975); *Commonwealth v. Roscioli*, 454 Pa. 59, 309 A.2d 396 (1973); *Commonwealth v. Garrett*, 423 Pa. 8, 222 A.2d 902 (1966); *Commonwealth v. Weaver*, 309 Pa.Super. 509, 455 A.2d 1199 (1982).

The crime of criminal conspiracy is defined by statute as follows:

(a) **Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S. § 903(a). "An individual is guilty of conspiracy if, with the intent to promote or facilitate a crime, he or she agreed to aid another person in the attempt, solicitation, planning, or commission of the crime." *Commonwealth v. Neckerauer*, 421 Pa.Super. 255, 268, 617 A.2d 1281, 1288 (1992) (en banc). "The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished." *Common-*

*wealth v. Keefer*, 338 Pa.Super. 184, 190, 487 A.2d 915, 918 (1985). See also: *Commonwealth v. Derr*, 501 Pa. 446, 462 A.2d 208 (1983); *Commonwealth v. French*, 396 Pa.Super. 436, 440, 578 A.2d 1292, 1294 (1990), *aff'd*, 531 Pa. 42, 611 A.2d 175 (1992). "Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent." *Commonwealth v. Sattazahn*, 428 Pa.Super. 413, ——, 631 A.2d 597, 602 (1993). See: *Commonwealth v. Schomaker*, 501 Pa. 404, 409–410, 461 A.2d 1220, 1222–1223 (1983); *Commonwealth v. Horner*, 497 Pa. 565, 570, 442 A.2d 682, 684 (1982).

" 'An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities.' " *Commonwealth v. Kennedy*, 499 Pa. 389, 395, 453 A.2d 927, 929–930 (1982), quoting *Commonwealth v. Strantz*, 328 Pa. 33, 43, 195 A. 75, 80 (1937). See also: *Commonwealth v. Campbell*, 353 Pa.Super. 178, 181, 509 A.2d 394, 395 (1986). "Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation." *Commonwealth v. Woodward*, 418 Pa.Super. 218, 226, 614 A.2d 239, 243 (1992). See also: *Commonwealth v. Kennedy, supra; Commonwealth v. Neckerauer, supra; Commonwealth v. Rogers*, 419 Pa.Super. 122, 139, 615 A.2d 55, 63 (1992); *Commonwealth v. Anderson*, 381 Pa.Super. 1, 15–16, 552 A.2d 1064, 1071 (1988).

Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred. *Commonwealth v. Carter*, 272 Pa.Super. 411, 416 A.2d 523 (1979).

*Commonwealth v. Lamb,* 309 Pa.Super. 415, 429, 455 A.2d 678, 685–686 (1983). See also: *Commonwealth v. Tillery,* 417 Pa.Super. 26, 31–32, 611 A.2d 1245, 1248 (1992); *Commonwealth v. Cooke,* 342 Pa.Super. 58, 67, 492 A.2d 63, 68 (1985); *Commonwealth v. Olds,* 322 Pa.Super. 442, 447–448, 469 A.2d 1072, 1075 (1983); *Commonwealth v. Anderson,* 265 Pa.Super. 494, 500–501, 402 A.2d 546, 549 (1979).

■ "To prove a criminal conspiracy the evidence must rise above mere suspicion or possibility of guilty collusion." *Commonwealth v. Burdell,* 380 Pa. 43, 49, 110 A.2d 193, 197 (1955). See also: *Commonwealth v. Yobbagy,* 410 Pa. 172, 178–179, 188 A.2d 750, 753 (1963); *Commonwealth v. Stein,* 401 Pa.Super. 518, 527, 585 A.2d 1048, 1052 (1991); *Commonwealth v. Frey,* 264 Pa.Super. 212, 215, 399 A.2d 742, 743 (1979). The decided cases have held that mere association or mere presence at the scene of the crime is insufficient to prove a conspiracy unless the defendant had prior knowledge of his alleged co-conspirator's criminal intent. Similarly, the defendant's mere knowledge of the proposed crime is insufficient to convict him of conspiracy absent proof that he became an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement. See: *Commonwealth v. Allen,* 425 Pa.Super. 615, 619, 625 A.2d 1266, 1269 (1993); *Commonwealth v. Davenport,* 307 Pa.Super. 102, 107–108, 452 A.2d 1058, 1061 (1982); *Commonwealth v. Lynch,* 270 Pa.Super. 554, 570, 411 A.2d 1224, 1232 (1979), *aff'd in part and rev'd in part,* 502 Pa. 359, 466 A.2d 991 (1983). See also: *Commonwealth v. Ocasio,* 422 Pa.Super. 272, 278–279, 619 A.2d 352, 355 (1993); *Commonwealth v. Mercado,* 420 Pa.Super. 588, 594–596, 617 A.2d 342, 345–346 (1992) (plurality opinion); *Commonwealth v. Henderson,* 249 Pa.Super. 472, 483, 378 A.2d 393, 398 (1977).

■ The evidence in the instant case, when viewed in the light most favorable to the Commonwealth, suggests that Martin Gruschin, appellant's alleged co-conspirator, used a crawlspace located in the front bedroom of the home in which appellant resided with his mother, in order to break into and steal property from two neighboring homes. There was no

evidence, however, that appellant had agreed to participate in the commission of these burglaries, or even that he knew of Gruschin's activity. The relationship, if any, existing between Gruschin and appellant was not shown by any evidence at appellant's trial. The evidence showed only that a neighbor, Margo Kinno, had on prior occasions observed Gruschin coming and going from the Swerdlow residence and that the Haverford Township Police had an arrest warrant for Gruschin listing the Swerdlow home as his residence.[1] Absent evidence of any relationship between appellant and Gruschin or evidence that appellant knew that Gruschin was committing burglaries of neighboring homes, there is simply no basis from which it can be inferred that appellant agreed to aid Gruschin in connection with such burglaries. There is nothing but the suspicion which arose because Gruschin may have stayed for a time in the home of appellant and his mother.[2]

Given the paucity of the evidence connecting appellant with Gruschin's crimes, the trial court's conclusion that appellant was acting as a lookout is sheer speculation. It is not a legitimate inference to be drawn from any evidence in this case. The mere fact that appellant opened his door and waved to the Haverford Township Police when they arrived is alone insufficient to permit an inference that it was done with an intent to distract the police while Gruschin escaped. Without evidence that appellant even knew that Gruschin was then engaged in committing a burglary, it cannot be concluded logically that he was acting as a lookout when he waved to the police. To repeat, therefore, the trial court's suggestion that appellant was acting as a lookout is simply unsupported by evidence and could have been based solely on speculation and

1. The Commonwealth, in its brief, has represented that appellant "falsely denied Gruschin's presence when police were looking for him." This statement is simply unsupported by any evidence at appellant's trial. The evidence discloses that on one occasion prior to January 4, 1991, the Haverford Township Police spoke with appellant about locating Gruschin. There is no evidence that appellant gave any false statements to police.

2. This fact, it would seem, is no more incriminating of appellant than of his mother. No one contends, however, that Mrs. Swerdlow was aware of Gruschin's illegal activities.

suspicion. There is in the record received no evidence on which to find appellant guilty of conspiring with Gruschin to commit any of the burglaries.

■ Appellant's convictions for criminal trespass and theft by receiving stolen property, therefore, must also fall. In finding appellant guilty of these offenses, the trial court concluded that appellant was responsible for the acts of his co-conspirator Gruschin. Because there was insufficient evidence to establish an unlawful confederacy, however, appellant cannot be deemed criminally responsible for Gruschin's actions. The evidence does not support a finding that appellant was Gruschin's accomplice. With respect to accomplice liability, the Superior Court has said:

> An accomplice is one who "knowingly and voluntarily cooperates with or aids another in the commission of a crime." *Commonwealth v. Carey*, 293 Pa.Super. 359, 373, 439 A.2d 151, 158 (1981). See: 18 Pa.C.S. § 306. See also: *Commonwealth v. Jones*, 213 Pa.Super. 504, 508, 247 A.2d 624, 626 (1968). To be an accomplice, "one must be an active partner in the intent to commit [the crime]." *Commonwealth v. Fields, supra* 460 Pa. at 319–320, 333 A.2d at 747; *Commonwealth v. McFadden*, 448 Pa. 146, 150, 292 A.2d 358, 360 (1972). "An [accomplice] must have done something to participate in the venture." *Commonwealth v. Flowers*, 479 Pa. 153, 156, 387 A.2d 1268, 1270 (1978).

*Commonwealth v. Brady*, 385 Pa.Super. 279, 284–285, 560 A.2d 802, 805 (1989). See also: *Commonwealth v. Calderini*, 416 Pa.Super. 258, 262–263, 611 A.2d 206, 208 (1992); *Commonwealth v. Smith*, 343 Pa.Super. 435, 448–449, 495 A.2d 543, 550 (1985). Here there was no evidence that appellant knew of Gruschin's intent to burglarize the neighboring homes or that he participated in any way in the commission of Gruschin's crimes.

It is not enough that appellant was present in his home at the time of Gruschin's commission of the burglary. Although this circumstance may have been sufficient to arouse one's suspicion, it was insufficient to establish beyond a reasonable

doubt that Swerdlow was a participant in the crime. The Commonwealth cannot rest on surmise and suspicion but must offer evidence proving guilty knowledge and participation. This it failed to do. The judgment of sentence, therefore, must be reversed.

The judgment of sentence is reversed, and appellant is discharged.