**COMMONWEALTH of Pennsylvania,
Appellee**

v.

**Kristine HOLSTEIN, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 14, 2006.

Filed June 15, 2007.

Rolfe C. Marsh, Media, for appellant.

Jonathan M. Levy, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: STEVENS, KLEIN, and PANELLA, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant Kristine Holstein's conviction on the charge of racing on the highway, 75 Pa.C.S.A. § 3367. Appellant's sole issue on appeal is that the evidence was insufficient to support her conviction for racing on the highway. We affirm.

¶ 2 In reviewing Appellant's sufficiency of the evidence claim, we are mindful that "[t]he law is settled in this Commonwealth that in reviewing the sufficiency of the evidence, the appellate court is required to review all the evidence and all reasonable inferences drawn therefrom in the light most favorable to the Commonwealth, ... [as the verdict winner]." *Commonwealth v. Earnest,* 386 Pa.Super. 461, 563 A.2d 158, 159 (Pa.Super.1989) (citation omitted). The test is whether the evidence, thus viewed, is sufficient to prove guilt beyond a reasonable doubt. *Id.* "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Swerdlow,* 431 Pa.Super. 453, 636 A.2d 1173, 1176 (1994) (quotation and quotation marks omitted).

¶ 3 At trial, the sole Commonwealth witness, Police Officer Raymond Rutter, testified on direct examination, in total, as follows:

**Direct Examination:**

**[By the District Attorney]:**

Q: Officer, I want to direct your attention back to May the 28th of this year, 2005, approximately 3:30 in the morning.

Were you on duty as a Philadelphia Police Officer?

A: Correct.

Q: And did your tour of duty take you to the area of 61st and Passayunk here in Philadelphia?

A: Correct, it did.

Q: And at that time did you come in contact with anyone you see in court today?

A: Correct, the young lady, blond hair, in the gray.

[District Attorney]: Indicating the defendant for the record.

[By the District Attorney]:

Q: Officer tell us what you observed with respect to the defendant that brings you into court today.

A: Yes, Your Honor.

My partner and I are assigned to a drag racing detail, 61st and Passayunk to 78th and Holsten. We were both in uniform in a marked patrol car that night at which time we pulled up to 61st and Passayunk on May 28th at approximately 3:29 in the a.m., at which time on that corner [is] a Hess Gas Station, 61st is on the right-hand side, on the left-hand side is Passayunk Avenue, on 61st Street they drag rac[e], on the right-hand side they all line up and watch, on the left-hand side, which is the Hess Gas Station, they all sit there and park in that area and also watch.

We pulled up as [we] usually do with our overhead, hit the horn and sirens, scatter them out. I pulled up in front of the defendant's vehicle, which was a tan Ford Focus, Pennsylvania Tag of EDD4038. The lights were out, she was the driver of the vehicle. At which time, I exited my vehicle, my partner exited her side, we approached the vehicle. At which time, with her lights out of the vehicle, she put the car in reverse and went around the Gas Station. [There] is an attendant that works in the middle, the pumps are to the right and left hand, her nose was to my vehicle with the lights out. When we exited the vehicle, she put it in reverse, she went around the pumps, around back where the attendant was, at which time we—

THE COURT: She did that in reverse?

THE WITNESS: Correct Ma'am.

At which time we got back in our vehicle and continued to follow the car. [There are] so many people running to scatter to get out of the area she almost struck a vehicle. And finally after going around, I believe it was two times, she pulled out on Passayunk Avenue where we did our vehicle stop.

[By the District Attorney]:

Q: When she was going in reverse around the pumps, were there pedestrians?

A: Oh, my God, yeah. They scattered like cockroaches, all trying to get in their vehicle to get out of there, "If I am not here I don't get caught." That's what it is.

Q: Approximately how many people would you estimate were there at that time when you pulled up?

A: Cars, anywhere from two to 300, people, about the same amount.

Q: After you conducted your stop, what happened after that?

A: We took down the license, registration, insurance. We issued her tickets. I believe there's a gentleman in the car but as of right now I can't recall everybody. If there [were] 10 people in the car, 10 people got tickets, that's how it is. And she was issued a citation. She was issued three of them: 3367, drag racing; 3373, fleeing police, and 3737A, reckless driving.

Q: Are those copies of the tickets I have in front of me today?

A: Yeah, they're the ones my partner filled out.

[District Attorney]: I'll mark those C–1, moved into evidence.

With that, I have no further questions for the officer.

[Defense Counsel]: I have no questions.

N.T. 12/15/05 at 4–7 (emphasis in original).

¶ 4 In her defense, Appellant testified, in total, as follows:

**Direct Examination:**

**[By Defense Counsel]:**

Q: [Defendant], you were present that night?

A: Yes, I was.

Q: Would you please state what happened?

A: That night, it was me, my boyfriend, my friend and her brother. My boyfriend decided he wanted to watch the races, as stupid [as] it was, I know it was wrong, I decided to go. We went into the gas station. My boyfriend had to use the bathroom so he went out to go to the bathroom. Not even a minute later did the cops show up. He came into the gas station with his overhead lights on, had his siren on maybe about a minute warning everybody to leave. They sat there, they watched everybody leave. The exit I had been facing was blocked off, I could not leave at that point. Also, my boyfriend was not back yet, I didn't want to leave him there, I didn't know what to do. The cops start shining their spotlights on the cars telling them to leave. I want to get out of there as soon as I could but [I was] still waiting for my boyfriend to get back in the car. He never actually got back in the car, I got really scared, I went to leave because I knew they wanted me to

leave. I put my car in reverse, I did not notice any pedestrians. They were all on the street by the cars. As I went to reverse to get out the other exit they [were] behind me, turned on their sirens. I stopped immediately. I was at a gas pump. They asked me to park my vehicle in the street so other people could use the gas pump, which I had done. I went to the street. The lady officer issued me my tickets. She asked me to sign them, I asked for a pen and she said, "Oh, are you refusing to sign the tickets? I'll write you a couple more." I said, "Can I please have your pen?" So I signed my tickets and I went on my way.

Q: Did you see them approach your car prior to you being put in the—putting the car in reverse, trying to reverse your direction?

A: No, their spotlight had been on me which is why I decided I had to leave at that point.

Q: So, did [they] not get out of their car prior to?

A: I did not see them leave their cars at all. They sat in the car, shined on their spotlight warnings, everybody to leave, mostly everybody had done that but they were still sitting watching everybody leave.

[Defense Counsel]: That's all I have.

[District Attorney]: I have no Questions.

N.T. 12/15/05 at 8–10 (emphasis in original).

¶ 5 Defense witness Ashley Holberton testified, in total, as follows:

**Direct Examination:**

**[By Defense Counsel]:**

Q: Miss Holberton, you were one of the passengers that night?

A: Yes.

Q: When the police told everybody to leave, what did you see from the back seat at that time?

A: The cop was just sitting there, he had his lights on and we were waiting there too long so we had reversed out.

Q: Did you see them get out of the car, prior—and approach the car prior to [Appellant] putting her car in reverse?

A: No, they did not get out of the car.

Q: They had not gotten out of the car prior to [the defendant] putting the car in reverse?

A: No, they were still in the car.

Q: Do you have anything further to add?

A: What she said was pretty much what happened.

[Defense Counsel]: That's all I have. That's all I have by way of witnesses.

N.T. 12/15/05 at 10–11 (emphasis in original).

¶ 6 The Commonwealth called Officer Rutter on rebuttal, and he testified, in total, as follows:

**Redirect Examination–Rebuttal**
**[By the District Attorney]:**

Q: Officer, you heard the two witnesses for the defense?

A: That's correct.

Q: Is there anything you disagree with?

A: Yeah, the bathrooms. There's no private bathrooms out there, Hess has a bathroom for the employees itself and they're for themselves at night, a female. There's no way they're going to open up a back door, let one gentleman come in when there's two or 300 people outside, especially when they're doing what they're doing.

Unless he was going to the bathroom somewhere where he wasn't supposed to be, he wasn't going to the bathroom, Your Honor.

Q: Also, you heard the defendant state you had never gotten out of your vehicle before she reversed.

Had you gotten out of your vehicle before?

A: That's her story, let her stay with it, but I got out of the vehicle.

Q: You had given her a visual sign to stop at that time?

A: Correct. They stated there w[ere] lights and sirens.

[District Attorney]: Okay.

I have no further questions.

[Defense Counsel]: That's all I have, Your Honor.

N.T. 12/15/05 at 12–13 (emphasis in original).

¶ 7 After a brief recess, the trial court found Appellant guilty of violating 75 Pa. C.S.A. § 3367 as a spectator of drag racing, requiring Appellant to pay a mandatory fine of $200. 75 Pa.C.S.A. § 3367(d). Appellant was found not guilty on the charges of reckless driving and fleeing the police. This timely appeal followed. All Pa.R.A.P.1925(b) requirements have been met.

¶ 8 75 Pa.C.S.A. § 3367 provides the following:

**§ 3367. Racing on highways**

(a) **Definitions.**—As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

"**Drag race.**" The operation of two or more vehicles from a point side by side at accelerating speeds in a competitive attempt to outdistance each other, or the operation of one or more vehicles over a common selected course, from the same point to the same point, for the purpose of comparing the relative speeds or power of acceleration of the vehicle or vehicles within a certain distance or time limit.

"**Race.**" The use of one or more vehicles in an attempt to outgain, outdistance or prevent another vehicle from passing, to arrive at a given destination ahead of another vehicle or vehicles, or to test the physical stamina or endurance of drivers over long distance driving routes.

**(b) General rule.**—No person shall drive a vehicle on a highway in any race, speed competition or contest, drag race or acceleration contest, test of physical endurance, exhibition of speed or acceleration, or for the purpose of making a speed record, and *no person shall in any manner participate in any such race, competition, contest, test or exhibition.*

**(c) Permits for special activities.**—The department or local authorities within their jurisdiction may issue permits for special activities which would otherwise be prohibited by this section.

**(d) Penalty.**—Any person violating this section is guilty of a summary offense and shall, upon conviction, be sentenced to pay a fine of $200.

(italics added, bold in original).

¶ 9 Here, the trial court concluded, and the evidence supports the finding, that Appellant was a knowing and voluntary spectator at an illegal drag race.[1] For instance, in her own testimony, Appellant confirmed that she went to the Hess gas station with the intent of watching an illegal drag race, even though she knew it was wrong. N.T. 12/15/05 at 8.[2] The issue presented is whether being a knowing spectator[3] of an illegal drag race requires the conclusion that Appellant violated Section 3367(b)'s prohibition against participating in a race in any manner. We conclude that it does.

¶ 10 In interpreting a statute, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage . . . ." 1 Pa. C.S.A. § 1903. In addition, "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa. C.S.A. § 1921(a).

¶ 11 Webster's Dictionary defines "participate" as "to take part" or "to have a part or share in something." Merriam Webster's Collegiate Dictionary 847 (10th ed.1993). The Legislature has declared it

1. There is no dispute that Appellant was not in the vicinity with the intent of driving or being a passenger in a car in the drag race. Rather, the evidence presented at trial, and the Commonwealth's arguments on appeal, confirm that Appellant was charged with a violation of Section 3367(b) because she was a knowing and voluntary spectator of drag racing.

2. There was no testimony establishing that a drag race actually occurred while Appellant was in the vicinity or that she witnessed such. However, Appellant has not raised this as an issue in her brief and, in fact, she states "[t]he appellant was sitting in her vehicle watching the races, when the police arrived on location." Appellant's Brief at 8.

3. This case is distinguishable from the scenario where the Commonwealth fails to prove that a person was a knowing spectator and just merely present when a drag race was occurring. In such a case, as is the case with many other crimes, mere presence at the scene would not be sufficient to establish guilt. *See Commonwealth v. Craven,* 572 Pa. 431, 817 A.2d 451 (2003) (holding that a knowing spectator does more than a person who is merely present at a particular place by happenstance). Rather, we conclude the Commonwealth must prove that the circumstances indicate a person is consciously and knowingly a spectator of a race, competition, contest, test, or exhibition. *See id.*

is a crime to take part in or share in drag racing **in any manner.** The Legislature's use of the phrase "in any manner" is a strong indicator that, in promulgating and adopting Section 3367, it was seeking to criminalize more than just the drivers, passengers, and organizers of these races. Rather, the Legislature was intending to criminalize those who are knowing spectators, who certainly "share in" the drag racing event. As the Supreme Court has stated, "[a] spectator does more than a person who is merely present at a particular place by happenstance, since a spectator, by definition, makes a conscious choice to view and witness an exhibition." *Commonwealth v. Craven,* 572 Pa. 431, 436, 817 A.2d 451, 454 (2003).

¶ 12 Our conclusion is further supported by the fact that "[t]he purpose of section 3367 is to ensure highway safety." *Commonwealth v. Ward,* 392 Pa.Super. 541, 545, 573 A.2d 595, 598 (1990) (footnote omitted). Our interpretation of Section 3367 assists this goal by banning those whose intentional presence encourages and promotes illegal racing. In this case, the evidence established that approximately three hundred vehicles and people were attracted to a rather small area of Philadelphia in order to view an illegal race. Such a high concentration of people and vehicles certainly does not "ensure highway safety."

¶ 13 Since Appellant admitted at trial that she knowingly attended an illegal drag racing event as a conscious and voluntary spectator, we conclude the evidence was sufficient to sustain her conviction under 75 Pa.C.S.A. § 3367.

¶ 14 Affirmed.

¶ 15 KLEIN, J., files a dissenting opinion.

Dissenting Opinion by KLEIN, J.:

¶ 1 It is undisputed that Kristine Holstein was only a spectator at the drag race. Therefore, the narrow issue is whether merely being a spectator fits within the statutory prohibition of 75 Pa.C.S.A. § 3367(b) that "no person shall *in any manner participate* in any such race, competition, contest, test or exhibition." [Emphasis supplied.]

¶ 2 I believe the answer has to be "no" for two reasons, and accordingly am compelled to dissent: first, because the legislature could have said "spectator" if it wished to criminalize merely being a spectator, as can be seen in the case involving dog fighting cited by the majority, *Commonwealth v. Craven,* 572 Pa. 431, 817 A.2d 451 (Pa.2003); and second, if the language is unclear, our rules of statutory construction require that penal statutes be strictly construed.

1. The legislature knows how to say "spectator"

¶ 3 *Craven, supra,* does stand for the proposition that it is constitutionally permissible to criminalize attending an illegal dog fight "as a spectator," whether or not a fee is paid to watch the fight. However, the statute specifically makes it criminal if someone *"attends an animal fight as a spectator."* 18 Pa.C.S. § 5511(h.1)(6) (emphasis added).

¶ 4 Therefore, it is clear the legislature was capable of stating that it is criminal if someone "attends a drag race as a spectator." But it did not do it. The logical conclusion is that the legislature did *not* mean to criminalize merely *attending* a drag race if the person does nothing more than show up and watch. *See* 1 Pa.C.S. § 1921(b) (when words of a statute are free and clear of all ambiguity, letter of statute is not to be disregarded under guise of pursuing its spirit); *see also Com-*

*monwealth v. Berryman,* 437 Pa.Super. 258, 649 A.2d 961, 965 (1994) *(en banc)* ("We may not add provisions [to a statute] which the legislature has omitted unless the phrase is necessary to the construction of the statute.").

¶ 5 As judges, it is our duty to interpret the law, not make it. It is up to the legislature, not this Court, to decide whether someone should be criminally sanctioned for attending a drag race. When the statutory language is clear, we should not strain to find an interpretation not supported by the language under the guise of following the general intent of the legislature. *See First Union Nat'l Bank v. Estate of Shevlin,* 897 A.2d 1241 (Pa.Super.2006) ("This Court, as an appellate court, cannot rewrite a statute under the pretext of interpreting it."); *Commonwealth v. Rieck Investment Corp.,* 419 Pa. 52, 213 A.2d 277 (1965) (it is not for courts to add to a statute, by interpretation, a requirement which the legislature did not see fit to include).

## 2. Penal statutes are to be strictly construed.

¶ 6 It is beyond dispute that penal statutes are to be strictly construed. That principle has been repeatedly cited by our appellate courts, and this Court recently phrased the principle as follows: "According to the rules of statutory construction, where an ambiguity exists in the language of a penal statute, it should be interpreted in the light most favorable to the criminally accused." *Commonwealth v. Ryan,* 909 A.2d 839, 842 (Pa.Super.2006); *see also Commonwealth v. Dickson,* 918 A.2d 95 (Pa.2007); *Commonwealth v. McClintic,* 589 Pa. 465, 909 A.2d 1241 (2006).

¶ 7 While obviously people know that drag racing is illegal, and will scatter when descended upon by police cars with flashing lights, it is not obvious that they are committing an illegal act *themselves* by watching a drag race. Being a spectator and being a participant are very different things. The logical interpretation of the statute is that it includes people who set out the course, send out notices of the event, serve as starters or otherwise do more than just watch the race.

¶ 8 To illustrate, it is like saying that someone in the stands at an Eagles or Steelers game is "participating" in the game. I am sure that Donovan McNabb or Ben Roethlisberger would not consider spectators in the stands "participants" in the game, even if their cheering helped drown out the other side's signal calling. To carry the argument to its illogical extreme, television viewers play a significant role in paying the salaries and keeping the NFL games going. No one would say someone watching on television is a "participant" in the game, although they may help the game more than someone watching a drag race helps the drag race.

¶ 9 If the language is ambiguous and capable of two different meanings, a strict construction favors not criminalizing that activity. That is the situation here.

¶ 10 Here, the word "participate" does not include being a spectator. As in the dog fighting statute, had the legislature intended to criminalize attending a drag race, it could have done so. At the very least, it is ambiguous. If it is ambiguous, our statutory rules of construction stipulate that penal statutes be strictly construed in favor of the accused. *See* 1 Pa.C.S. § 1921(b); 1928(b)(1); *see also Commonwealth v. Scolieri,* 571 Pa. 658, 813 A.2d 672, 673 (2002) ("[W]hen the General Assembly selects words to use in a statute, it has chosen them purposefully. We cannot change those words to reflect our own public policy concerns, nor can we edit them based on the supposition that we

know what the General Assembly meant to say when it said something different.").

¶ 11 Therefore, unless and until the legislature amends the statute, I believe merely watching a drag race as a spectator and doing nothing more is not criminal. For that reason, I must dissent.