J-S16038-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOSE ANTONIO RAMOS | |
| Appellant | No. 1153 MDA 2014 |

Appeal from the Judgment of Sentence April 24, 2014
In the Court of Common Pleas of Luzerne County
Criminal Division at No(s): CP-40-CR-0003982-2012

BEFORE:  PANELLA, J., OLSON, J., and OTT, J.

MEMORANDUM BY OTT, J.: **FILED MAY 06, 2015**

Jose Antonio Ramos appeals from the judgment of sentence entered April 24, 2014, in the Luzerne County Court of Common Pleas.  Ramos was sentenced to a term of six to 20 years' imprisonment following his jury conviction for failing to comply with the registration requirements of sexual offenders.[1]   On appeal, Ramos challenges the sufficiency of the evidence supporting his conviction, as well as the trial court's decision to permit the attorney who prosecuted him for the underlying sex offenses to testify at his sentencing hearing.  For the reasons set forth below, we affirm.

---

[1] **See** 18 Pa.C.S. § 4915.  Section 4915 expired on December 20, 2012, and was replaced by 18 Pa.C.S. § 4915.1.  Section 4915.1 contains similar language and proscribes the same conduct, but refers to the provisions of the Sexual Offenders Registration and Notification Act (SORNA), 42 Pa.C.S. §§ 9799.10-9799.41, which replaced Pennsylvania's Megan's Law effective December 20, 2012.

The facts underlying Ramos's conviction are as follows. Ramos was scheduled to be released from prison on November 7, 2012, after serving a 27-year sentence for sexual offenses.[2] Pursuant to his registration obligations as a Megan's Law offender, Ramos was required to provide an address as to where he intended to live after his release. Ramos signed a Sex Offender Registration Form, in which he attested that he was going to live with his cousin at 955 Leggett Avenue, Bronx, New York. However, the Pennsylvania State Police subsequently discovered that Ramos had not spoken with his cousin in 30 years, his cousin no longer lived at that address, and Ramos actually plannned to live in a hotel with a female friend and her grandson. Therefore, on the day of his release, Ramos was re-arrested and charged with one count of failing to comply with the registration requirements of sexual offenders.

On January 23, 2014, a jury found Ramos guilty of the above offense. Ramos subsequently filed a motion to set aside the verdict based upon the Supreme Court's decision in **Commonwealth v. Neiman**, 84 A.3d 603 (Pa.

---

[2] The certified record does not include any information regarding Ramos's underlying sexual offenses, nor does it include the presentence investigation report ordered in this case. However, we can glean from the sentencing transcript that Ramos was convicted of, *inter alia*, involuntary deviate sexual intercourse for his sexual abuse of a young boy. **See** N.T., 4/24/2014, at 10.

2013),[3] which the trial court denied. On April 24, 2014, the trial court imposed a standard range sentence of six to 20 years' imprisonment. Ramos filed a motion for reconsideration of sentence, and an amended motion, which the trial court denied on April 30, 2014. This timely appeal followed.[4]

In his first issue, Ramos challenges the sufficiency of the evidence supporting his conviction.[5] Our review of such a claim is well-settled:

_____

[3] In **Neiman**, the Supreme Court held that Act 152 of 2004, which, *inter alia*, modified and replaced the then-existing version of Megan's Law, violated the single subject rule. **Neiman**, **supra**, 84 A.3d at 605. The Court struck the Act in its entirety, but stayed its decision for 90 days "in order to provide a reasonable amount of time for the General Assembly to consider appropriate remedial measures, or to allow for a smooth transition period." **Id.** at 616. Thereafter, the Legislature amended the statute to address the decision in **Neiman**. **See** 42 Pa.C.S. § 9799.11(b)(3). The amended act applies to, *inter alia*, an individual who (1) "was required to register with the Pennsylvania State Police pursuant to this subchapter prior to December 20, 2012, and who had not fulfilled the individual's period of registration as of December 20, 2012;" and (2) "who between January 23, 2005, and December 19, 2012, was … released from a period of incarceration resulting from a conviction for a sexually violent offense[.]" 42 Pa.C.S. §§ 9799.13(3)(i), (3.1)(i)(B). Therefore, the registration requirements of the statute are applicable to Ramos.

[4] On June 10, 2014, Ramos complied with the trial court's directive to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

[5] We note that the trial court found this issue waived because Ramos's concise statement was not sufficiently specific to preserve this claim on appeal. **See** Trial Court Opinion, 8/22/2014, at 11. While we agree Ramos did not specify in his concise statement how the evidence was insufficient, we decline to find waiver here where Ramos was convicted of only one,
*(Footnote Continued Next Page)*

In reviewing sufficiency of evidence claims, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all the elements of the offense. *See Commonwealth v. Bullick*, 830 A.2d 998, 1000 (Pa. Super. 2003). Additionally, to sustain a conviction, the facts and circumstances which the Commonwealth must prove, must be such that every essential element of the crime is established beyond a reasonable doubt. *See Commonwealth v. Hargrave*, 745 A.2d 20, 22 (Pa. Super. 2000), *appeal denied,* 563 Pa. 683, 760 A.2d 851 (2000). Admittedly, guilt must be based on facts and conditions proved, and not on suspicion or surmise. *See Commonwealth v. Swerdlow*, 431 Pa.Super. 453, 636 A.2d 1173 (1994). Entirely circumstantial evidence is sufficient so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. *See id.; see also Commonwealth v. Chmiel*, 536 Pa. 244, 247, 639 A.2d 9, 11 (1994). Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *See Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. 2001), *appeal denied,* 569 Pa. 716, 806 A.2d 858 (2002). The fact finder is free to believe all, part, or none of the evidence presented at trial. *See Commonwealth v. Nicotra*, 425 Pa.Super. 600, 625 A.2d 1259, 1261 (1993).

*Commonwealth v. Moreno*, 14 A.3d 133, 136 (Pa. Super. 2011), *appeal denied*, 44 A.3d 1161 (Pa. 2012).

---

*(Footnote Continued)* _____

relatively straightforward charge. *See Commonwealth v. Laboy*, 936 A.2d 1058, 1060 (Pa. 2007) (remanding appeal to Superior Court for merits analysis of sufficiency claim in "relatively straightforward drug case."). Moreover, the trial court did conclude in its opinion that the evidence was sufficient to support the verdict. Accordingly, our appellate review is not impeded.

Ramos was convicted of one count of failing to comply with the registration of sexual offenders requirements set forth at 18 Pa.C.S. § 4915. The statute provides, in relevant part:

**(a) Offense defined.**-- An individual who is subject to registration under 42 Pa.C.S. § 9795.1(a) or (a.1) (relating to registration) or an individual who is subject to registration under 42 Pa.C.S. § 9795.1(b) or who was subject to registration under former 42 Pa.C.S § 9793 (relating to registration of certain offenders for ten years) commits an offense if he knowingly fails to:

\* \* \* \*

(3) **provide accurate information when registering under 42 Pa.C.S. § 9795.2** or verifying an address a residence under 42 Pa.C.S. § 9796.

42 Pa.C.S. § 4915 (emphasis supplied). Moreover, Section 9795.2(a) mandates, *inter alia*:

**(a) Registration.—**

(1) Offenders and sexually violent predators shall be required to register with the Pennsylvania State Police upon release from incarceration, upon parole from a State or county correctional institution or upon the commencement of a sentence of intermediate punishment or probation. **For purposes of registration, offenders and sexually violent predators shall provide the Pennsylvania State Police with all current or intended residences**[.]

\* \* \* \*

4) This paragraph shall apply to all offenders and sexually violent predators:

(i) … **Where the offender or sexually violent predator is scheduled to be released from a State correctional facility** or county correctional facility **because of the expiration of the**

- 5 -

> **maximum term of incarceration,** the Department of Corrections or county correctional facility shall collect the information from the offender or sexually violent predator **no later than ten days prior to the maximum expiration date**. The registration information shall be forwarded to the Pennsylvania State Police.

42 Pa.C.S. § 9795.2(a)(1), (4)(i) (emphasis supplied). The statute also defines a residence as "[a] location where an individual … intends to be domiciled for 30 consecutive days or more during a calendar year[,]" and may include a "temporary place of abode" such as a "homeless shelter or park, where the individual is lodged." 42 Pa.C.S. § 9792. Therefore, the Commonwealth was required to prove beyond a reasonable doubt that Ramos knowingly failed to provide accurate information regarding his intended residence upon release from prison.

Ramos argues the evidence was insufficient to support his conviction because he did **intend** to reside at 944 Leggett Avenue "if in fact his family had still resided there." Ramos's Brief at 15, 17. Moreover, he asserts his understanding was that "if he did not find a place to stay, he had 48 hours to find another place and register with the state police." *Id.* at 15. *See* 42 Pa.C.S. § 9795.2(a)(2)(i) ("Offenders … shall inform the Pennsylvania State Police within 48 hours of … [a]ny change of residence or establishment of an additional residence or residences."). Because he was immediately arrested upon his release from prison, Ramos contends he had no opportunity to find another residence upon learning that his family no longer resided at the Leggett Avenue address.

Our review of the record reveals ample support for the jury's verdict. Indeed, the evidence was sufficient for the jury to conclude that Ramos never **intended** to reside at 944 Leggett Avenue, and, therefore, knowingly provided inaccurate information to the Pennsylvania State Police prior to his release.

The testimony at trial revealed the following. Francis Depiero, a counselor at SCI-Dallas, met with Ramos four times between October 1, 2012 and October 11, 2012, to help him prepare for reintegration in society, and complete the required Megan's Law registration paperwork. As noted above, Ramos was scheduled for release on November 7, 2012.

During their first meeting, Depiero told Ramos that Ramos needed to provide an address where he would be living after his impending release so that he could be registered for Megan's Law purposes. He also informed Ramos that he could help Ramos find a shelter if he had nowhere else to go. Ramos told Depiero that he intended to live in an apartment at 944 Leggett Avenue. Depiero repeated this information to Bernadette Cotterman, the records specialist at SCI-Dallas. After Cotterman realized the address was an apartment complex, she requested Depiero obtain a more specific address for Ramos. Ramos then indicated that he would be living on the third floor of the apartment building. *See* N.T., 1/21/2014, at 55-59.

On October 11, 2012, Ramos met with Cotterman and Depiero, who provided him with a "Megan's Law Sexual Offender Registration" form that explained his registration requirements. Cotterman read Ramos the form,

which Ramos acknowledged he understood and signed. The form detailed Ramos's intention to reside at 944 Leggett Avenue, 3rd floor, upon his release, and listed the name of his cousin, "Mildred Otero-Valentine," as the person with whom he intended to reside. *See id.* at 75-86.

Thereafter, the Pennsylvania State Police contacted the New York Police Department (NYPD) to confirm Ramos's intended residence. Upon their inspection of the apartment building, the NYPD learned that none of the residents knew Ramos, but there were two vacant apartments in the building, one of which was on the third floor. However, the owner of the building, James Gisondi, confirmed that he had never been contacted by Ramos, and had never agreed to lease an apartment to Ramos. *See id.* at 91-96, 151-152.

After further investigation, the NYPD discovered that Ramos's cousin, Mildred Lebron had once lived on the third floor of the building.[6] Nevertheless, Lebron confirmed that (1) she had not lived at 944 Leggett Avenue since 1983; (2) Ramos had never lived there with her and her family; (3) she had not spoken to Ramos for more than 30 years prior; and

---

[6] The detectives also learned that Lebron's mother's maiden name was "Otero," and both her father's and brother's first name was "Valentine." N.T., 1/21/2014, at 100. Lebron testified that she had never used the name "Mildred Otero-Valentine." *Id.* at 107.

- 8 -

(4) she had not given Ramos permission to live with her after his release from prison. *Id.* at 107-108, 115.

Lebron also testified that Ramos began calling her collect from prison **after** November 7, 2012. When she refused to accept the calls, he wrote her a letter, which she received on December 27, 2012. In the letter, Ramos stated that he had "no idea that [she] no longer lived at 944 Leggett Avenue" but that he "**had no intentions of living with [her]**." *Id.* at 115, 116 (emphasis supplied). Rather, he wrote, "I just gave your address in order to go and register with the police for I was really going to go down to Miami to visit my parents and father's grave site." *Id.* at 115.

In mid-October 2012, the Department of Corrections began intercepting Ramos's mail. During that time, Corrections Captain Mark Pall intercepted a letter Ramos received from Janet Hicks, a woman with whom he had been corresponding "[a]lmost on a daily basis." *Id.* at 163. Ramos would type a letter to Hicks, who would then handwrite a response on the same letter. On one of the intercepted letters, apparently written by Ramos sometime before September 30, 2012, Ramos instructed Hicks to meet him at the New York City Port Authority bus terminal on November 7, 2012, the date of his scheduled release, with her grandson, Tony. The letter further stated:

> These people will not release me until I have some place for me to go to …. So please make sure you have a hotel room for us on November 7th, 2012 at the Mayflower [Hotel] or at Ye Olde Carlson Arms Hotel[.]

*Id.* at 170. Ramos wrote he intended to visit his parents' grave site in Miami, and stated that he, Hicks, and Tony could take a trip there after his release. Regarding Hicks's grandson, Ramos also wrote the following:

> As for your grandson Tony, you mentioned that you spoke with him on the phone and that he was ready to leave town with me. Did you get his father's approval for him to go with us.
>
> As for him writing to me, all he has to do is go to the library near his home and write a nice long letter about himself. Tell him on the phone that he is to let me know what kind of hobbies that he has and what are his favorite things that he likes to do. Also, if you have any recent pictures of him, please send them to me.

*Id.* at 172.[7] Nowhere in the letter did Ramos mention the Leggett Avenue address.

Ramos testified, however, that he believed his family members, including his cousin, still lived at the 944 Leggett Avenue address, and he "was under the impression [he] had to give an address … [or] they weren't going to let [him] go." *Id.* at 203, 204. He also believed that if he did not have a place to stay, he "had 48 hours to go find another place and then to register with the state police." *Id.* at 206. With regard to the letter he wrote the Hicks, Ramos stated he asked her to get a hotel room so he would

---

[7] We note that the jury was not informed of the nature of Ramos's underlying sexual assault convictions. Rather the parties agreed to provide the jury with the stipulation that Ramos "is an individual who is required by law to register his residence with the Pennsylvania State Police." *Id.* at 51-52. Through the testimony, the jury also learned that Ramos had been incarcerated for 27 years for a sexual offense.

"at least have some place to go" if he could not stay with his cousin. *Id.* at 210. Further, he explained Hicks "has a hard time dealing with society" and that as far as he knew, her grandson, Tony, "was a figment of [Hicks's] imagination." *Id.* at 211. However, Ramos admitted that he did not try to contact his cousin before his release date, and that he had not spoken to his family for 35 years. *See id.* at 216-221.

Ramos also presented the testimony of Rabbi Howard Cohen, whom he befriended when he was housed at SCI Graterford. Rabbi Cohen testified that he remained in contact with Ramos and had offered to drive him to his intended residence the day of Ramos's release from prison. Rabbi Cohen further testified that Ramos told him he planned to go to the Leggett Avenue address. *See id.* at 120-124.

Viewing this testimony in the light most favorable to the Commonwealth, we conclude the jury had more than sufficient evidence to convict Ramos of failing to comply with registration requirements. It is undisputed that Ramos was required to register as a sexual offender, and was subject to the registration requirements set forth in Section 9795.2. Further, Ramos's failure to contact any of his family members prior to his release, to inquire whether he could live with them at the 944 Leggett Avenue apartment, as well as his stated intentions to reside elsewhere in his letters to Hicks and Lebron, support the jury's determination that Ramos knowingly provided inaccurate information to the State Police, that is, he **never intended** to reside at the Bronx apartment. While Ramos testified to

the contrary, the jury acted within its discretion when it rejected his self-serving testimony. **See Moreno**, **supra**. Accordingly, Ramos is entitled to no relief regarding his first issue.

Next, Ramos contends that, during the sentencing hearing, the trial court abused its discretion when it permitted the Commonwealth to present as a witness Stuart Grabois, Esquire, the attorney who prosecuted him for the underlying sex offenses. This claim challenges the discretionary aspects of Ramos's sentence.

Because the right to appeal the discretionary aspects of a sentence is not absolute, in order to reach the merits of such a claim, this Court must first determine:

> (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

**Commonwealth v. Dunphy**, 20 A.3d 1215, 1220 (Pa. Super. 2011) (footnotes omitted). Here, although Ramos did not include this claim in either his original or amended post-sentence motion, he objected to Garbois's testimony during the sentencing hearing, and included the claim in his Pa.R.A.P. 1925(b) concise statement.[8] Therefore, we find Ramos has

_____

[8] Ramos also argues in this brief that the trial court punished him more harshly because he chose to go to trial. **See** Ramos's Brief at 3, 21. However, that claim was not raised in either of his motions for
*(Footnote Continued Next Page)*

preserved this claim for our review, and proceed to determine whether he has set forth a substantial question that his sentence is inappropriate under the Sentencing Code. *See Commonwealth v. Titus*, 816 A.2d 251, 255 (Pa. Super. 2003).

A substantial question exists when an appellant sets forth "a colorable argument that the sentence imposed is either inconsistent with a specific provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing process." *Commonwealth v. Ventura*, 975 A.2d 1128, 1133 (Pa. Super. 2009), *appeal denied*, 987 A.2d 161 (Pa. 2009) (citation omitted). Here, Ramos contends the court "considered impermissible factors and relied upon erroneous information that would render his sentence invalid." Ramos's Brief at 19. Such a claim raises a substantial question. *See Commonwealth v. Macias*, 968 A.2d 773, 776 (Pa. Super. 2009) ("[A]n allegation that the court considered an impermissible sentencing factor raises a substantial question.") (citation omitted).

In support of his claim, Ramos argues the trial court "gave improper weight to the testimony of Grabois, who was neither the prosecutor, the victim or witness in this matter[.]" Ramos's Brief at 19. However, the trial court specifically denied this claim in its opinion, stating:

*(Footnote Continued)* ―――――――――

reconsideration of his sentence, during the sentencing hearing, or in his Rule 1925(b) concise statement. Accordingly, it is waived. *Dunphy*, *supra*.

> We took Mr. Grabois's testimony into consideration when fashioning a sentence along with all other testimony, evidence, and argument provided at the time of the sentencing hearing, including, most importantly, the PSI. Moreover, aside from Mr. Grabois calling [Ramos] a "monster," he said nothing else that we did not already know having listened to the testimony presented at trial or having gleaned from the PSI.

Trial Court Opinion, 8/22/2014, at 5.[9]

Furthermore, as noted above, the trial court had the benefit of a presentence investigation report,[10] and imposed a sentence within the standard range of the sentencing guidelines. It is well-established that "[s]entencing is a matter vested in the sound discretion of the judge, and will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Sheller*, 961 A.2d 187, 190 (Pa. Super. 2008) (citation omitted), *appeal denied*, 980 A.2d 607 (Pa. 2009). Having found no abuse of discretion on the part of the trial court, we conclude that Ramos's second issue also fails.

Judgment of sentence affirmed.

---

[9] We note the transcript from the sentencing hearing demonstrates the trial court did not give undue weight to Grabois's characterization of Ramos as a "monster." When Ramos's attorney objected to Grabois's use of the term, the trial court stated "I guess it's his opinion. … It is argumentative and for sentencing purposes." N.T., 4/24/2014, at 12.

[10] *See Commonwealth v. Downing*, 990 A.2d 788, 794 (Pa. Super. 2010) (citation omitted) (holding that where trial court had the benefit of a presentence investigation report, we will presume it was "aware of all appropriate sentencing factors and considerations.")

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/6/2015