J. S03028/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| AMINA JOHNSON, | : | No. 1138 EDA 2015 |
| | : | |
| Appellant | : | |

Appeal from the PCRA Order, March 23, 2015,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0806702-2005

BEFORE: FORD ELLIOTT, P.J.E., OTT AND JENKINS, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED MARCH 15, 2016**

Amina Johnson appeals from the order of March 23, 2015, dismissing her first petition for post-conviction collateral relief.[1] After careful review, we affirm.

The PCRA court has summarized the history of this case as follows:

> On May 17, 2005, at approximately 10:00 P.M., Philadelphia Police Officer Joseph Paraschak responded to a radio call of a person shot at 19 West Duval Street in the City and County of Philadelphia. When Officer Paraschak arrived on location he observed a large group of people on the front lawn and porch of 19 West Duval Street. He was met by Michele Long (Michele), a resident of the property and an off duty Philadelphia Police Officer. Michele was very distressed and was requesting assistance for her brother who was inside the house. Officer Paraschak observed evidence that a shooting had occurred at the location. When

[1] Post-Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546.

Officer Paraschak went inside 19 West Duval Street, he observed an African American male, later identified as Kenneth Baptiste, Jr. (Kenneth), on the floor, unresponsive, bleeding from the head. He also observed a female, later identified as Ebony Long (Ebony), who had been shot in the arm. Officer Paraschak called for an ambulance. After securing the scene, he observed approximately 21 shell casings in the street, a fragment on the pathway leading to the house, and a brown revolver holster on a chair on the porch.

Officer Ryan Teaford, who also responded to the radio call, arrived within two minutes of Officer Paraschak. Officer Teaford was directed to the house by Ebony who requested assistance for her brother. Officer Teaford observed that Ebony was bleeding from her arm. When he entered 19 West Duval Street, he observed Kenneth on the floor bleeding and unresponsive. Officer Teaford accompanied Kenneth and his attending medics as he was evacuated to Einstein Hospital by ambulance. Kenneth never regained consciousness and was pronounced dead at 2:20 P.M. on May 18, 2005. Ebony was transported to the same hospital in a separate ambulance. Officer Teaford interviewed Ebony at the hospital and she told Officer Teaford that she fought with Appellant earlier near Woodlawn and McMahon Streets. Ebony described a male wearing a red hat and blue jeans, and Appellant's sisters as persons who she observed on Duval Street during the shooting.

Officer Stephen Arbiz also responded to the initial radio call. On scene, he was approached by Michele who was Ebony's sister. Michele was pleading for help for her brother. She told Officer Arbiz that Appellant's boyfriend, Gregory Price (Gregory), was present during the shooting. Officer Arbiz ascertained the name and address of Gregory's mother as well as Appellant's address and that the suspects were traveling in a black Yukon.

At approximately 10:30 P.M. on May 17, 2005, Officer Warren Smith responded to a radio call to go to Crosson Street to meet a complainant in reference to an assault and was met there by Appellant. Appellant told Officer Smith that she had been assaulted on Duval Street approximately forty-five minutes to an hour earlier by a group of males and females. One of the females she recognized was Ebony who she related was a woman who formerly had a relationship with her baby's father. Officer Smith noted a few lumps on her forehead after Appellant told him that a male punched her several times. Appellant indicated that she had gone to Duval Street with the intention of fighting Ebony. When she arrived, Ebony's sister, Michele, lifted her shirt revealing a black handgun tucked into her pants. Michele said no one was to enter the fight besides the two women or else she would shoot. Appellant did not mention the shooting at 19 West Duval Street when speaking with Officer Smith. Officer Smith asked her what the name of her baby's father was and where he lived, but Appellant feigned ignorance. Officer Smith wrote an incident report characterizing the information as a domestic issue and advised Appellant to seek a protection order.

The ensuing homicide investigation into Kenneth's death revealed that there had been an ongoing feud between Appellant and Ebony surrounding their relationship with Gregory. Ebony testified that she had begun what she believed to be an exclusive relationship with Gregory about three years prior to the incident. She first came in contact with Appellant in February 2003. Appellant and three or four of her girlfriends confronted Ebony regarding Gregory. Appellant informed Ebony that Gregory was her boyfriend and that Ebony should stay away from him or else there would be a fight. During this incident, Appellant was very angry and aggressive. Ebony confronted Gregory about the incident that night, but Gregory told Ebony that Appellant was lying. Gregory said that he would speak with Appellant and would instruct her to leave Ebony alone. Following this incident, Appellant and

her friends would call Ebony's cell phone and make snide remarks or hang up. Ebony told Gregory about the calls and he said he would speak with Appellant again and reiterated that he was not in a relationship with Appellant. Later, Gregory told Ebony that Appellant was pregnant with his child. Ebony broke up with Gregory thereafter.

In late 2003 or early 2004, Gregory, Appellant and another woman came into Ebony's workplace at the King of Prussia Mall. Ebony observed that Appellant was pregnant. Appellant and the other woman were laughing and pointing at Ebony. Appellant remarked to Ebony that she had Gregory now; she was pregnant with his child. Gregory did not say anything.

Ebony saw Appellant again, while Appellant was pregnant, at a neighborhood restaurant where Ebony had stopped to get food before going to work. Appellant and three or four female friends followed Ebony out of the restaurant and accused Ebony of talking about Appellant. Appellant watched as one of her female friends shoved Ebony and another tripped Ebony although Ebony did not fall. Ebony walked away and called her parent to pick her up.

Ebony continued to have contact with Gregory after realizing that Appellant was pregnant although Gregory told her that he chose to be with Appellant and his child. During the first week of May 2005, Ebony and Gregory had a chance encounter at the gas station located at Germantown and Washington Lane. Gregory was driving a black Yukon that belonged to his cousin, Raphael Hill (Raphael). Gregory and Ebony spoke for about five minutes before parting company. Appellant later called Ebony warning her to stay away from Gregory.

On May 17, 2005, Ebony dropped her nephew off at 5th and Lindley Streets, and was taking her mother to a seafood store that was located three to four blocks from Appellant's house when she observed Appellant leaning against a car on Crosson

Street. Ebony's car contained her mother Rene Baptiste (Rene), her brother, Kenneth, her cousin Remmia, and her two year old niece. Appellant, who was with an unidentified male and female, upon observing Ebony's car drive by, became angry and yelled down the street at Ebony, asking if she had come to fight her. Ebony stopped her car near Crosson and Woodlawn Streets, exited the vehicle, walked back toward Appellant, and the two began to fight. The unidentified male ran back toward the Appellant's home and the unidentified female entered the fight. The female hit Ebony, pulled her hair, and kicked her in the back while Ebony was on top of Appellant. Appellant was trying to push Ebony off. The fight stopped when Ebony's mother and brother came and broke up the fight. Rene pulled Ebony off of Appellant, and Kenneth pulled the unidentified female off of Ebony and then took Ebony to the car. Appellant and the female told Kenneth that he would die for laying hands on them. Appellant also screamed Ebony's name. Gregory was not present at the fight.

The fight took place at approximately 8:30 P.M. and it took about ten minutes for Ebony and everyone in the car to get to 19 West Duval Street. Shortly after she arrived home, Ebony received a phone call from Gregory, berating her about the fight and threatening her should she return. Ebony replied that it had been a fair fight and hung up. Gregory called back to yell at her and finally threatened that the next time he saw her, "It's a wrap."

When the car arrived home, Rene told her daughter, Michele, about the fight. Michele had been asleep on the third floor, but was awakened when she heard Rene arguing with Ebony. Michele came downstairs and Rene told her that Ebony had been in a fight. Michele, Kenneth, and Rene were outside on the porch at that point. Ebony was standing on the porch telling Michele what happened, when two vehicles came speeding down Duval Street, a black Yukon, driven by Gregory, and a silver Grand Am.

Ebony recognized the Yukon as the one Gregory drove on previous occasions. When the vehicles stopped in front of 23-25 West Duval, Ebony saw four males and about six females. The occupants exited the vehicles and began walking up the street towards 19 West Duval while screaming. Ebony also recognized Appellant, Appellant's two sisters and the girl that was at the fight earlier. Ebony went inside her house, grabbed a bat and came back out. Appellant was on the sidewalk in front of Ebony's house at the time. Gregory was standing next to Appellant and one of the males, later identified as Raphael, in front of 21 West Duval. When Appellant pointed Ebony and Kenneth out, members of Appellant's group opened fire. Rene tried to run inside the house and Gregory yelled, "Bitches, don't run now." Ebony observed Gregory shoot first followed by Raphael and an unidentified male.

Michele observed the Yukon go down the street before the shooting began. She heard Rene say, "he has something in his hand," right before she heard gunshots. Michele then went towards the walkway that separated her house from the neighbor's and laid flat on the step. Kenneth was still standing on the step. Although Michele had her off duty firearm, she did not return fire because she was unable to accurately observe the shooters. Michele grabbed Kenneth's arm and told him to get down. After the shooting stopped, Kenneth got up and said he was shot. He had blood on his face and fell to the ground. Michele and other family members carried him to the floor inside the home while they attempted to stabilize his injuries.

Abdul Torrence (Abdul), a cousin of Ebony and Michele, also testified at trial. Abdul testified that, on May 17, 2005, he and his wife, Karen, came to Philadelphia to visit with family and to retrieve documents. At the time, he was under the supervision of the New York penal system, but did not notify his probation officer that he was going to Philadelphia in violation of the terms of his supervision. Additionally, he possessed a firearm

against the terms of his supervision. Upon arrival in Philadelphia, Abdul and his wife visited his grandmother, Georgia Torrence, and then went to Ebony's house at 19 West Duval Street. Abdul accompanied Ebony, Karen, Rene, and Abdul's daughter when they went to the store and witnessed the fight between Appellant and Ebony. He testified that Ebony and Appellant were fighting and fell to the ground. Other people then tried to break the fight up. Abdul observed additional males and females running towards the fight. He described the situation as chaotic with people yelling and trying to intervene. He did not observe Kenneth hit anyone. Abdul, Ebony, Karen, Rene, Kenneth, and Abdul's daughter then left the area and returned to Duval Street.

Upon arriving back at 19 West Duval Street after the incident, Abdul walked down Duval Street to his car which was parked about five houses down from Germantown Avenue. Abdul testified that he was standing outside smoking a cigarette when he noticed a little gray car, tailgating a black truck, drive past him. Upon seeing this, he retrieved a revolver from his car, put it on his hip and walked back to the house located at 19 West Duval Street. As he was about to enter the house, he saw the two vehicles again with the truck traveling in the rear. Abdul walked off the porch and onto the front lawn. He observed five to seven people, males and females, exit the car and one male exit the passenger's side of the truck. He did not see the driver of the truck. As these individuals approached the house, Abdul yelled for his family to get inside the house. He then concealed himself by a bush located in front of the house and observed Gregory standing with an unidentified male. After hearing a gunshot, Abdul took out his gun and fired toward Gregory and the male who was on the sidewalk, aiming his gun towards the porch of 19 West Duval Street. Gregory and the unidentified male retreated while continuing to fire. Abdul then observed a third shooter come diagonally across from the area of 26-28 Duval Street. Abdul fired the remaining

rounds in his revolver. Moments later, the shooting stopped. Abdul placed his gun in his pocket and ran up the steps of 19 West Duval to assess the situation. With police arriving, Abdul became concerned about possible probation violation issues so he left to change clothing and disposed of the firearm in the river. He also went to the hospital to check on the condition of his cousin.

On July 5, 2005, Officer Cherie Klinger and her partner Officer McKenna were in the area of 21st and Spencer Streets when they stopped a Pontiac Grand Prix, operated by Gregory, for motor vehicle violations. Officer Klinger noticed an empty gun holster, in an upright position, between Gregory and the edge of his seat. Officer Klinger checked the area around Gregory and recovered a [.]9mm Smith & Wesson firearm, loaded with 15 live rounds, from the pouch behind the passenger's seat. Gregory told Officers that he did not have a permit to carry a weapon and he was subsequently arrested. The gun, bullets and holster were placed on a property receipt and submitted to the Firearms Identification Unit (FIU) for analysis. Officer Robert Stott of the FIU analyzed the ballistic evidence recovered from the shooting at Duval Street and also compared the ballistic evidence with the firearm recovered from the car stop. Officer Stott found that the firearm found in Gregory's car was the gun that fired the .9mm FCC's [(fired cartridge casings)] found at Duval Street.

Appellant was subsequently arrested and charged with murder and conspiracy in the death of Kenneth and attempted murder, aggravated assault and conspiracy in the shooting of Ebony. On July 5, 2007, Appellant was convicted of third degree murder, attempted murder, aggravated assault and two counts of conspiracy and was sentenced to 8-16 years['] incarceration.

PCRA court opinion, 6/17/15 at 1-8.

Post-sentence motions were denied, and on October 21, 2010, this court affirmed the judgment of sentence. ***Commonwealth v. Johnson***, No. 52 EDA 2008, unpublished memorandum (Pa.Super. filed 10/21/10). Our supreme court denied allowance of appeal on March 15, 2011. ***Commonwealth v. Johnson***, No. 660 EAL 2010 (***per curiam***). On May 27, 2011, appellant filed a timely ***pro se*** PCRA petition. Counsel was appointed and filed an amended petition on her behalf. On March 23, 2015, following Rule 907[2] notice, appellant's petition was dismissed without a hearing.[3] A timely notice of appeal was filed on April 17, 2015. On April 21, 2015, appellant was ordered to file a concise statement of errors complained of on appeal within 21 days pursuant to Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A.; appellant complied on May 12, 2015, and the PCRA court has filed a Rule 1925(a) opinion.

Appellant has raised the following issue for this court's review:

> I.  Did the PCRA Court err when it dismissed the Defendant's Amended PCRA Petition without a Hearing and all where the Defendant properly pled and would have been able to prove that she was entitled to PCRA relief?

Appellant's brief at 3.

Initially, we recite our standard of review:

---

[2] Pa.R.Crim.P., Rule 907, 42 Pa.C.S.A.

[3] As explained by the PCRA court, the proceedings were continued several times, including at appellant's request, to locate and investigate potential witnesses. (PCRA court opinion, 6/17/15 at 9.)

> This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. ***Commonwealth v. Halley***, 582 Pa. 164, 870 A.2d 795, 799 n. 2 (2005). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. ***Commonwealth v. Carr***, 768 A.2d 1164, 1166 (Pa.Super.2001).

***Commonwealth v. Turetsky***, 925 A.2d 876, 879 (Pa.Super. 2007),

***appeal denied***, 940 A.2d 365 (Pa. 2007).

> [T]he right to an evidentiary hearing on a post-conviction petition is not absolute. ***Commonwealth v. Jordan***, 772 A.2d 1011, 1014 (Pa.Super.2001). It is within the PCRA court's discretion to decline to hold a hearing if the petitioner's claim is patently frivolous and has no support either in the record or other evidence. ***Id.*** It is the responsibility of the reviewing court on appeal to examine each issue raised in the PCRA petition in light of the record certified before it in order to determine if the PCRA court erred in its determination that there were no genuine issues of material fact in controversy and in denying relief without conducting an evidentiary hearing. ***Commonwealth v. Hardcastle***, 549 Pa. 450, 454, 701 A.2d 541, 542-543 (1997).

***Id.*** at 882, quoting ***Commonwealth v. Khalifah***, 852 A.2d 1238, 1239-1240 (Pa.Super. 2004).

Appellant raises two claims of counsel ineffectiveness. First, appellant argues that trial counsel was ineffective for failing to request a corrupt and polluted source instruction with regard to Abdul Torrence ("Abdul"). Second, appellant argues that appellate counsel was ineffective for failing to raise a challenge to the sufficiency of the evidence to support her conviction for

conspiracy to commit murder. For the reasons discussed ***infra***, we find that neither contention has arguable merit.

> The law presumes counsel has rendered effective assistance. ***Commonwealth v. Gonzalez***, 858 A.2d 1219, 1222 (Pa.Super.2004), ***appeal denied***, 582 Pa. 695, 871 A.2d 189 (2005). To establish a claim of ineffective assistance of counsel, Appellant must demonstrate (1) the underlying claim is of arguable merit; (2) counsel's action or inaction lacked any reasonable basis designed to effectuate Appellant's interest; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. ***Commonwealth v. Johnson***, 868 A.2d 1278, 1281 (Pa.Super.2005), ***appeal denied***, 583 Pa. 680, 877 A.2d 460 (2005) (internal citations omitted); ***Gonzalez***, ***supra***. The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. ***Commonwealth v. Rush***, 576 Pa. 3, 838 A.2d 651 (2003). "The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit. . . ." ***Commonwealth v. Pierce***, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." ***Commonwealth v. Poplawski***, 852 A.2d 323, 327 (Pa.Super.2004).

***Commonwealth v. Taylor***, 933 A.2d 1035, 1041-1042 (Pa.Super. 2007), ***appeal denied***, 951 A.2d 1163 (Pa. 2008).

Appellant argues trial counsel was ineffective for failing to request a corrupt-source instruction in connection with Abdul's testimony. She maintains she was entitled to a corrupt-source charge because there was sufficient evidence to present a question to the jury concerning whether

Abdul was an accomplice. Appellant argues that Abdul willingly participated in a shoot-out on a public street. (Appellant's brief at 9-10.) According to appellant, by firing his weapon, Abdul encouraged others to return fire. (*Id.* at 10.) Appellant contends that regardless of which side he was on, Abdul's criminal conduct warranted the corrupt and polluted source instruction. (*Id.* at 9-10.) We disagree.

> "[I]t 'is well established that, in any case in which an accomplice implicates the defendant, the [judge] should instruct the jury that the accomplice is a corrupt and polluted source whose testimony should be considered with caution.'" *Commonwealth v. Hanible*, 612 Pa. 183, 30 A.3d 426, 462 (2011) (citation omitted). A corrupt-source instruction is warranted where sufficient evidence is presented as to whether the witness is an accomplice. *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167, 1181 (1999). An individual is an accomplice if, with intent to promote or facilitate the commission of the offense, he solicits, aids, agrees, or attempts to aid another person in planning or committing the offense. 18 Pa.C.S. § 306(c)(1).

*Commonwealth v. Treiber*, 121 A.3d 435, 459 (Pa. 2015).

Instantly, Abdul was not appellant's accomplice. He was hiding behind a bush as appellant and her cohorts approached the house. Abdul did not retrieve his weapon until shots were fired. As the PCRA court states, "In the case at hand, Abdul was a relative of the decedent and was never charged as an accomplice. He was at the scene of the crime, but was on the receiving end of the gunfire directed at the decedent and Ebony." (PCRA court opinion, 6/17/15 at 15 (citations to the transcript omitted).) There

was no evidence presented at trial from which the jury could have reasonably inferred Abdul was appellant's accomplice. There was no evidence he took part in appellant's crimes. Because appellant was not entitled to a corrupt-source instruction, her ineffectiveness claim fails for lack of arguable merit.

Next, appellant argues that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence to support her conviction of criminal conspiracy to commit murder.[4] According to appellant, she was merely present at the scene. (Appellant's brief at 14.) Appellant argues that although she and Ebony had a history of animosity, there was no evidence that she knew anyone was armed or incited anyone to open fire on the decedent and his family. (**Id.** at 13-14.) Appellant argues that the Commonwealth failed to prove a conspiratorial agreement to commit murder; rather, appellant contends that, "[she] wanted to have a simple fistfight while others, on their own, decided to engage in an open air, Wild West type of shoot out." (**Id.** at 15.)

> Appellant's initial challenge to the sufficiency of
> the evidence requires that we view the evidence, and

---

[4] On direct appeal, appellant argued that the evidence was insufficient to convict her of third-degree murder. **Johnson**, **supra** at *10. However, because she did not challenge the conviction for conspiracy, we found she waived that challenge and was, therefore, necessarily guilty of the underlying crime of third-degree murder. **Id.** at *12, citing **Commonwealth v. McCall**, 911 A.2d 992, 997 (Pa.Super. 2006) (even where a conspirator did not act as a principal in committing the underlying crime, she is still criminally liable for the actions of her co-conspirators) (additional citation omitted).

all reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth in deciding whether the evidence was sufficient to establish each element of the crimes beyond a reasonable doubt. *Commonwealth v. McNair*, 529 Pa. 368, 371, 603 A.2d 1014 (1992).

Moreover, "'[w]hen conflicts and discrepancies arise, it is within the province of the jury to determine the weight to be given to each [witness's] testimony and to believe all, part, or none of the evidence as [it] deems appropriate.'" *Commonwealth v. Wright*, 722 A.2d 157, 161 (Pa.Super.1998) (quoting *Commonwealth v. Verdekal*, 351 Pa.Super. 412, 506 A.2d 415, 419 (1986)).

To convict an accused of third degree murder, the Commonwealth must prove that the accused killed another person with malice. *Commonwealth v. Hardy*, 918 A.2d 766, 774 (Pa.Super.2007).

The elements of third degree murder, as developed by case law, are a killing done with legal malice but without specific intent to kill required in first degree murder. Malice is the essential element of third degree murder, and is the distinguishing factor between murder and manslaughter.

*Commonwealth v. Cruz–Centeno*, 447 Pa.Super. 98, 668 A.2d 536, 539 (1995), *allocatur denied*, 544 Pa. 653, 676 A.2d 1195 (1996).

Malice under the law "comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intending to be injured." *Commonwealth v. Thomas*, 527 Pa. 511, 514, 594 A.2d 300 (1991). "Malice may be inferred from the 'attending circumstances of the act resulting in death.'"

- 14 -

*Commonwealth v. Lee*, 426 Pa.Super. 345, 626 A.2d 1238, 1241 (1993) (quoting *Commonwealth v. Gardner*, 490 Pa. 421, 424, 416 A.2d 1007 (1980)). Otherwise stated, malice may be found where the defendant has consciously disregarded an unjustified and extremely high risk that her conduct might cause death or serious injury to another. *Commonwealth v. Young*, 494 Pa. 224, 228, 431 A.2d 230 (1981).

To convict of criminal conspiracy, the evidence must establish that the defendant entered an agreement with another person to commit or aid in the commission of an unlawful act, that the conspirators acted with a shared criminal intent, and that an overt act was done in furtherance of the conspiracy. 18 Pa.C.S.A. § 903; *Commonwealth v. Johnson*, 719 A.2d 778, 784 (Pa.Super.1998), *allocatur denied*, 559 Pa. 689, 739 A.2d 1056 (1999). "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Swerdlow*, 431 Pa.Super. 453, 636 A.2d 1173, 1177 (1994). "An agreement sufficient to establish a conspiracy can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Commonwealth v. Rivera*, 432 Pa.Super. 88, 637 A.2d 997, 998 (1994) (*en banc*)[.]

Once a conspiracy is established, the actions of each co-conspirator may be imputed to the other conspirators. In this regard, "[t]he law in Pennsylvania is settled that each conspirator is criminally responsible for the actions of his co-conspirator, provided that the actions are accomplished in furtherance of the common design." *Commonwealth v. Baskerville*, 452 Pa.Super. 82, 681 A.2d 195, 201 (1996). Furthermore,

> Where the existence of a conspiracy is established, the law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators if such acts are done in pursuance of the common design or purpose of the conspiracy. Such responsibility attaches even though such conspirator was not physically present when the acts were committed by his fellow conspirator or conspirators and extends even to a homicide which is a contingency of the natural and probable execution of the conspiracy, even though such homicide is not specifically contemplated by the parties.
>
> *Commonwealth v. Eiland*, 450 Pa. 566, 570-71, 301 A.2d 651 (1973).

*Commonwealth v. Geiger*, 944 A.2d 85, 90-91 (Pa.Super. 2008), *appeal denied*, 964 A.2d 1 (Pa. 2009).

Instantly, the Commonwealth established that appellant and Ebony had a long history of animosity revolving around their relationship with Gregory. Ebony had been dating Gregory, who was also the father of appellant's child. During one incident while appellant was pregnant, appellant's friends confronted Ebony at a restaurant and physically attacked her while appellant stood by and watched. On May 17, 2005, the night of the shooting, appellant and Ebony were fighting and had to be physically separated. Appellant and an unidentified female companion were yelling at Kenneth and threatening him due to his interference.

Shortly thereafter, Ebony received a phone call from Gregory, threatening that when he saw her again, "it's a wrap." When appellant and her cohorts, including Gregory, arrived at 19 West Duval Street, they were yelling and screaming. As appellant got closer to the front porch, she pointed out Kenneth and Ebony to the rest of the group. Kenneth, the decedent, sustained a fatal gunshot to the head; Ebony was shot in the arm. Police recovered 21 FCC's from the scene including seven that were fired from the .9mm Smith & Wesson recovered from Gregory's vehicle. *Johnson*, *supra* at *9, citing trial court opinion, 9/17/09 at 1-14. Appellant and her cohorts left the scene together. Later, when appellant made the report to police, she did not mention the shooting at 19 West Duval Street and told police that she did not know the baby's father's name or where he lived.

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, it was overwhelmingly sufficient to support appellant's conviction of criminal conspiracy to commit third-degree murder. Appellant was more than merely present at the scene of the shooting. As the PCRA court states, "The overarching context of the events was the long running dispute between Ebony and Appellant that involved both verbal and physical confrontations stemming from their mutual relationship with Gregory." (PCRA court opinion, 6/17/15 at 13.) As the underlying issue lacks arguable merit and would not have been successful on direct appeal, appellate

counsel cannot be held ineffective for failing to have raised it. This claim fails.[5]

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/15/2016

---

[5] In her Rule 1925(b) statement, appellant also alleged that trial counsel was ineffective for failing to call certain witnesses. (Docket #24.) However, as the PCRA court observes, despite being provided with funds for an investigator, appellant's final amended PCRA petition does not identify any potential witnesses. (PCRA court opinion, 6/17/15 at 15.) Apparently, appellant has abandoned this argument on appeal.