J-A06042-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BERNARD K. BOND | : | |
| | : | |
| Appellant | : | No. 1701 EDA 2018 |

Appeal from the Judgment of Sentence February 9, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  C.P.-51-CR-0000733-2017

BEFORE:  STABILE, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    March 25, 2020

Appellant, Bernard K. Bond, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his conviction by a jury on the sole charge of criminal conspiracy (to commit robbery).[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: Following his arrest in connection with a robbery, Appellant, who was represented by counsel, proceeded to a jury trial.  At trial, Sergeant Marcus O'Shaughnessy testified that, on October 4, 2016, he was on duty when at approximately 10:30 a.m. he received a call for a "robbery in progress, point of gun" at the

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 903.

Carolina Market, which is a grocery market located at 2952 Ridge Avenue. N.T., 11/28/17, at 25-27, 33.

The officer received "flash information"[2] over the Computer Aided Dispatch indicating two black males were involved: one of the black males was five-foot seven, wearing a blue jacket and blue jeans, while the other black male was six-foot wearing a blue hoodie and blue pants. *Id.* at 33. He further received information over the radio that the "the first black male was armed with a black handgun and the second black male was armed with a .357 Magnum….[The first male] was 25 to 30 years old, medium build, short hair. The other one in his 40's, light complexion." *Id.* at 34.

Sergeant O'Shaughnessy arrived at the Carolina Market within "a few minutes" of receiving the radio call, and he found the victim, Jay Truesdale, standing on the corner outside of the market. *Id.* at 31. Mr. Truesdale, who appeared to be very upset, explained that "the males pulled a gun on him, took money from his out of his car, took his keys to the car, and [took] his cell phone." *Id.* at 35. He reported the men then fled westbound on Fontain Street from 30th. *Id.*

Sergeant O'Shaughnessy indicated that, based on the information provided to him, he completed an incident report describing the suspects as

---

[2] "[F]lash information is based on a report from the initial officers to investigate the scene of a crime and is broadcast to other police units in the district." *Commonwealth v. Jackson*, 519 A.2d 427, 431 (Pa.Super. 1986).

"[f]irst black male medium complexion, six-foot one, medium build, blue jacket, blue pa[nt]s, armed with a handgun. Number 2 black male, medium complexion, five-foot seven, blue hoodie, blue jeans." *Id.* at 37.

Detective Earl Martin testified he was assigned as the lead investigator, and he interviewed Mr. Truesdale, who was still quite upset, at the police station shortly after the robbery occurred. N.T., 11/29/17, at 14-15. During the interview, Mr. Truesdale identified Appellant, who was his cousin, and a male named "Duly" as suspects. *Id.* at 18-19. Mr. Truesdale described "Duly" as a "[b]lack male, tall, athletic build, 20's, late 20's, earlier 30's with a tattoo on his neck." *Id.* at 22. Although the detective put the name "Duly" into the police database, no photograph or information "popped up." *Id.* The general description provided by Mr. Truesdale as to "Duly" generated "hundreds of thousands of photos" such that the police were unable to identify "Duly's" true identity. *Id.*

Mr. Truesdale also gave the detective a description of Appellant, including what he was wearing at the time of the robbery, his name, his date of birth, and his home address of 1828 South Taylor Street. *Id.* at 23-24. The detective entered the information into the police database and, when Appellant's photograph appeared on the screen, Mr. Truesdale immediately pointed to the photograph and said, "That's my cousin. That's my cousin." *Id.* Mr. Truesdale then signed and dated the photograph. *Id.*

Detective Martin testified Mr. Truesdale had no hesitation identifying Appellant as being involved in the robbery. *Id.* at 25-26. He also testified Mr. Truesdale confirmed his cellular phone, $150.00 in cash, and his car keys were taken during the robbery. *Id.* at 26. Moreover, Mr. Truesdale reported Appellant was armed with a .357 revolver during the robbery. *Id.* at 27-28.

Detective Martin testified that, after he interviewed Mr. Truesdale, he went to the Carolina Market on the day of the incident and seized footage from surveillance cameras, which were located inside and outside of the market. *Id.* at 48. The video footage was entered into evidence.[3] *Id.* at 46-48.

Detective Martin testified that, on October 4, 2016, at 9:30 p.m., the police executed a search warrant at Appellant's residence. *Id.* at 32. No one was home at the time of the search. *Id.* During the search of a bedroom, the police found mail addressed to Appellant. *Id.* However, the police did not discover a firearm or any of the victim's missing items. *Id.* at 32-33. Detective Martin then obtained an arrest warrant, which he attempted to serve on Appellant at his residence on October 6, 2017, to no avail. *Id.* at 37-38. Ultimately, Appellant was arrested on October 26, 2017, at 800 West Rockland Street. *Id.* at 40.

Mr. Truesdale, who indicated in court that he recognized Appellant, testified Appellant is his "family." *Id.* at 61-63. Specifically, Mr. Truesdale

---

[3] We note the disc containing the video surveillance footage was included in the certified record to this Court.

explained his stepfather, who raised him since he was an infant, was Appellant's uncle. *Id.* at 61. Mr. Truesdale indicated Appellant was his step-cousin and, prior to the instant incident, they were "pretty close." *Id.* at 63. Mr. Truesdale testified that, at one point, he gave Appellant money and took care of him because he was his family. *Id.* at 64.

Regarding October 4, 2016, the day of the robbery, Mr. Truesdale testified that, as he was driving home from work after the overnight shift, he stopped at the Carolina Market in the morning to get a cup of coffee. *Id.* at 66. Mr. Truesdale explained he stopped his vehicle near the front of the market, went inside, and saw Appellant standing by another younger man who he knew as "Duly." *Id.* at 71-72. Mr. Truesdale testified he did not stop to talk to Appellant or "Duly" but proceeded to get a coffee. *Id.* at 75.

Mr. Truesdale testified he felt nervous seeing the two men together because he and Appellant were not "seeing eye to eye" on various things at that point in time. *Id.* Also, he explained he had lent $100.00 to "Duly," and about a week before the robbery, he saw "Duly" and asked him when he was going to pay back the money. *Id.* at 74. In response, "Duly" pulled a 9 millimeter handgun on him and said, "I ain't got it. What you're [*sic*] going to do?" *Id.*

Mr. Truesdale testified he did not speak to "Duly" while he was in the Carolina Market on October 4, 2016; however, as Mr. Truesdale was waiting for his coffee to be prepared by the man behind the counter, Appellant

approached him and asked him for "a couple [of] dollars." *Id.* at 77. Mr. Truesdale testified he went out to his car, retrieved $5.00, came back into the market, and gave Appellant $5.00. *Id.* at 81-82. He noticed Appellant and "Duly" were "huddled" together conversing when he came back inside of the market to give Appellant the $5.00. *Id.* at 82.

After Mr. Truesdale paid for his coffee, he left the store, spoke briefly to a friend across the street, and began walking to his vehicle when he noticed Appellant and "Duly" exiting the market together while still conversing with each other. *Id.* at 84. As Mr. Truesdale approached the driver's side door, he saw Appellant and "Duly" approach and stand by the front passenger side door of the vehicle. *Id.* at 85. Mr. Truesdale testified the following occurred:

> **Q.** At some point do they start having words with you?
> **A.** Yes.
> **Q.** And do you recall what that was about?
> **A.** My cousin actually told me, you know, You got a problem with my young bol? Y'all need to handle it. Actually, I said to my cousin, What do you mean I need to handle a problem with your young bol? We're supposed to be family and he looked at me like I was crazy.
> **Q.** Okay. And at some point do you eventually get into your vehicle?
> **A.** Yes.
> **Q.** When you get into your vehicle, did something happen to you while you're inside of your car?
> **A.** Yes. The young guy, he came. He opened my car door. He got in my car with the gun and he took my money out of my glove compartment where I had my money at and he took my car keys.
> **Q.** All right. Did you have anything else inside of your glove—are you talking about the center console of the car?

- 6 -

**A.** The armrest.  I had my money in the armrest.

**Q.**  That would be between the driver and passenger seat?

**A.** Yes.

**Q.** In the front?

**A.** Yes.

**Q.** Did you have anything else other than your money?

**A.** He took my car keys.

**Q.** Did you have a cell phone on you that day?

**A.** Yes, he took my cell phone, too.

**Q.** Where was that at?

**A.** That was in the console.

**Q.** It was in there, too?

**A.** Yes.

**Q.** How much money was inside?

**A.** I had just got paid.  It was about $150.  It was a small paycheck because I only worked about two or three days that day [*sic*], but I just had it in my console.

**Q.** All right.  Do you –is that where you always keep money?

**A.** Yes.  Correct.

**Q.** Does anyone else know where you keep your money?

**A.** Correct.

**Q.** Who?

**A.** [Appellant].

***

**Q.** When this individual Duly pulls out the gun, do you remember where he pulled the gun from?

**A.** Out of his jacket pocket.

**Q.** Jacket pocket?

**A.** Uh, huh.

**Q.** What kind of gun was it?

**A.** 9 millimeter.

***

**Q.** Now, where is [Appellant] at when this is happening?

**A.** Actually, he was like standing outside. Like it looked like he was coaching everything.

**Q.** Why do you say it looked like that?

**A.** Because literally like he—I literally looked at him and asked him, like you would actually let this man rob me like this? He looked at me like I was crazy. Like, my own flesh. I'm not going to call him my flesh and blood. I'm just going to call him [Appellant]. If you see on the video, I said, You're really going to let this happen to me after all I done for you? And he looked at me like I was crazy.

**Q.** Okay. What did you do when you first saw the gun?

**A.** Man, I was paranoid. I was paranoid. I did not know if he was going to shoot me or if he wasn't going to shoot me.

**Q.** So you were afraid?

**A.** Yes, I was afraid.

**Q.** Did Duly say anything to you?

**A.** He said, If you make a move, I'm going to kill you.

**Q.** All right. So do you get out of the car? Do you stay in the car?

**A.** Like when he was in the car with the gun, I actually got out of the car. And that's when I looked at [Appellant]. I said, You're going to literally let this happen? And that's when he got the money out of the armrest. He got my car keys. He got out of the car. And after I said what I said to [Appellant] ["Duly"] said, Come on. We out. We out. We out. We out. Get let's [*sic*] of here.

*Id.* at 85-90.

Mr. Truesdale testified Appellant and "Duly" walked back into the market together while Mr. Truesdale attempted to stop someone on the street so that he could call 911. *Id.* at 91. A brief time later, Appellant and "Duly" exited the market together, and Mr. Truesdale asked Appellant how he could "let something like that happen[,]" to which Appellant responded, "That's your

beef. That's y'all problem. That's y'all issue. I ain't got nothing to do with that." *Id.* Mr. Truesdale then watched while Appellant and "Duly" walked area from the area together. *Id.* at 91-92. Finally, a passerby permitted Mr. Truesdale to use his cellphone so that he could call 911 to report the robbery. *Id.* at 95.

Mr. Truesdale testified that after the police arrived on the scene he gave them a description of the perpetrators, and he confirmed he gave a statement to the detectives at police headquarters. *Id.* at 98. He also confirmed he provided Appellant's identity as one of the perpetrators, and he affirmatively identified Appellant from a police photograph. *Id.* at 98-99. Mr. Truesdale admitted he specifically informed Detective Martin that "Appellant was involved in th[e] robbery[.]" *Id.* at 100.

Mr. Truesdale confirmed that, during Appellant's preliminary hearing on January 24, 2017, he testified Appellant had nothing to do with the robbery. *Id.* at 102. However, Mr. Truesdale explained he gave such testimony at the preliminary hearing because he was "afraid for [his] life because two guys had confronted [him] before [he] went to court and told [him] that [he] better go to court and [he] better say [Appellant] didn't have nothing [*sic*] to do with it." *Id.* Mr. Truesdale testified that, after he testified at Appellant's preliminary hearing, he left Pennsylvania and stayed in a homeless shelter in a different state because he was afraid for his life. *Id.* at 107-08.

Upon reviewing the October 4, 2016, video surveillance footage from inside and outside of the Carolina Market in the courtroom, Mr. Truesdale confirmed the video depicted him going into the market, and "Duly" and Appellant were also inside of the market. *Id.* at 115-16. The video depicted Mr. Truesdale retrieving the money from his vehicle and handing the money to Appellant inside the market. *Id.* at 117.

Mr. Truesdale confirmed the video depicted that, after he gave the money to Appellant, and he got his coffee, he left the market and crossed the street to talk to a friend. *Id.* at 120. The video depicts Appellant following Mr. Truesdale out of the market, glancing at Mr. Truesdale as he crossed the street, leaning into Mr. Truesdale's vehicle via the opened front passenger window, and rifling around inside the vehicle. *Id.* at 120. Mr. Truesdale testified he went back to his vehicle and asked Appellant what he was looking for in the vehicle. *Id.* at 121. Mr. Truesdale testified he did not give Appellant permission to look or search for anything inside of his vehicle. *Id.*

Mr. Truesdale confirmed the video then depicts that Mr. Truesdale went back across the street while Appellant went inside of the Carolina Market. *Id.* at 122. Shortly thereafter, the video shows Appellant and "Duly" exiting the market together and approaching Mr. Truesdale's vehicle on the passenger side while Mr. Truesdale re-approached the vehicle on the driver's side. *Id.* at 123. Pointing to the video, Mr. Truesdale testified he quickly entered his vehicle with the intent of driving away; however, before he could do so, "Duly"

- 10 -

entered the passenger side with his gun drawn. *Id.* at 123-24. The video depicts Appellant walking around to the driver's side, and Mr. Truesdale quickly jumping out of his vehicle. *Id.*

Mr. Truesdale testified he asked Appellant why he was letting "this go down[,]" and Appellant said "F" you to Mr. Truesdale. *Id.* at 124. The video shows "Duly" removing items from the center console while Appellant remained by Mr. Truesdale's side. *Id.* at 124. The video shows "Duly" exiting the vehicle and walking into the market while Appellant continued exchanging words with Mr. Truesdale. *Id.* at 125-26. Within fifteen seconds, Appellant went back into the market with "Duly." *Id.* at 126-27. Mr. Truesdale confirmed the video reveals that, after Appellant rejoined "Duly" in the market, Appellant shook "Duly's" hand. *Id.* at 137.

Police Officer Peter Plousis testified that on October 26, 2016, he went to the 800 block of West Rockland Street to "backup the execution of an arrest warrant" on Appellant. *Id.* at 150. Officer Plousis indicated that by the time he arrived on the scene Appellant was already in custody, and he transported Appellant to the police station. *Id.* at 152-53. Officer Plousis indicated Appellant provided biographical information for a police form, and Appellant listed his address as "1828 South Taylor." *Id.* at 153-54.

At the conclusion of the Commonwealth's case, Appellant made a motion for a judgment of acquittal, and the trial court denied the motion.[4] *Id.* at 158. The jury convicted Appellant solely on one count of conspiracy (to commit robbery) and acquitted him on the charges of robbery, theft by unlawful taking, firearms not to be carried without a license, and carrying firearms in public in Philadelphia. N.T., 11/30/17, at 36-37.

The Commonwealth filed a notice of intent to seek the imposition of a mandatory sentence pursuant to 42 Pa.C.S.A. § 9714. On February 9, 2018, following a hearing, the trial court sentenced Appellant to ten years to twenty years in prison. On February 20, 2018, Appellant filed a timely, counseled post-sentence motion,[5] and on June 12, 2018, he filed a notice of appeal. On June 21, 2018, the Clerk of Courts entered an order denying Appellant's post-

---

[4] The defense offered no witnesses, and Appellant voluntarily waived his right to testify. *Id.* at 159-60.

[5] Generally, a defendant has ten days to file post-sentence motions. Pa.R.Crim.P. 720. Here, the time period expired on Monday, February 19, 2018, which was a legal holiday. Accordingly, Appellant had until Tuesday, February 20, 2018, to file a timely post-sentence motion. *See* 1 Pa.C.S.A. § 1908 ("Whenever the last day of any such period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation [of time].").

sentence motion by operation of law.[6]  All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant's sole issue is whether the evidence was sufficient to sustain his conviction for criminal conspiracy (to commit robbery).  In this regard, Appellant contends there is no evidence of a conspiratorial agreement between him and any other person and, in fact, he was merely present when the robbery occurred.

A successful sufficiency-of-the-evidence claim requires discharge.  **Commonwealth v. Toritto**, 67 A.3d 29 (Pa.Super. 2013) (*en banc*).  Whether the evidence was sufficient to sustain the charge presents a question of law.  **Id.**  Our standard of review is *de novo*, and our scope of review is plenary.  **Commonwealth v. Walls**, 144 A.3d 926 (Pa.Super. 2016).  In conducting our inquiry, we examine:

> whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the

---

[6] Appellant filed post-sentence motions on February 20, 2018, and a premature notice of appeal on June 12, 2018, before the court ruled on the post-sentence motions.  The post-sentence motions were denied by operation of law on June 21, 2018.  Thus, Appellant's appeal relates forward to June 21, 2018, and there are no jurisdictional impediments to our review. **See Commonwealth v. Borrero**, 692 A.2d 158 (Pa.Super. 1997) (explaining general rule that if defendant files timely post-sentence motion, judgment of sentence does not become final for purposes of appeal until trial court disposes of motion or motion is denied by operation of law). **See also Commonwealth v. Ratushny**, 17 A.3d 1269, 1271 n.4 (Pa.Super. 2011) (explaining if court denies an appellant's post-sentence motion following filing of premature notice of appeal, this Court will treat the appellant's premature notice of appeal as having been filed after entry of order disposing of post-sentence motion).

Commonwealth as verdict-winner, [is] sufficient to establish all elements of the offense beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. When evaluating the credibility and weight of the evidence, the fact-finder is free to believe all, part or none of the evidence. For purposes of our review under these principles, we must review the entire record and consider all of the evidence introduced.

*Commonwealth v. Trinidad*, 96 A.3d 1031, 1038 (Pa.Super. 2014)

(quotation omitted). Further, a conviction may be sustained wholly on

circumstantial evidence. *Commonwealth v. Melvin*, 103 A.3d 1, 39-40

(Pa.Super. 2014).

The Crimes Code relevantly defines the crime of "conspiracy" as follows:

**(a) Definition of conspiracy.--**A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903 (bold in original).

In examining this statutory provision, this Court has held the following:

The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished. Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient. Rather, the Commonwealth must prove that the defendant shared the criminal intent, *i.e.,* that the Appellant was "an active participant in the criminal enterprise and that he had

- 14 -

knowledge of the conspiratorial agreement." The defendant does not need to commit the overt act; a co-conspirator may commit the overt act. ***Commonwealth v. Johnson***, 719 A.2d 778, 784 (Pa.Super. 1998) (*en banc*)[.]

A conspiracy is almost always proved through circumstantial evidence. ***Commonwealth v. Swerdlow***, 636 A.2d 1173, 1176 ([Pa.Super.] 1994). "The conduct of the parties and the circumstances surrounding their conduct may create 'a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." ***Johnson***, 719 A.2d at 785. The evidence must, however, "rise above mere suspicion or possibility of guilty collusion." ***Swerdlow***, 636 A.2d at 1177 (citation omitted).

This Court has identified factors to be considered:

> Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred.

***Commonwealth v. Olds***, 469 A.2d 1072, 1075 ([Pa.Super.] 1983).

Once there is evidence of the presence of a conspiracy, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy.

> The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. The co-conspirator rule assigns legal culpability equally to all members of the conspiracy. All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such

actions and regardless of which member of the conspiracy undertook the action.

***Commonwealth v. Galindes***, 786 A.2d 1004, 1011 (Pa.Super. 2001).

The premise of the rule is that the conspirators have formed together for an unlawful purpose, and thus, they share the intent to commit any acts undertaken in order to achieve that purpose, regardless of whether they actually intended any distinct act undertaken in furtherance of the object of the conspiracy. It is the existence of shared criminal intent that "is the *sine qua non* of a conspiracy."

***Commonwealth v. Lambert***, 795 A.2d 1010, 1016-17 (Pa.Super. 2002) (*en banc*) (some citations and quotations omitted). Ultimately, "where the conduct of the parties indicate that they were acting in concert with a corrupt purpose in view, the existence of a criminal conspiracy may properly be inferred." ***Commonwealth v. Kinard***, 95 A.3d 279, 293 (Pa.Super. 2014) (*en banc*).

Reviewing the record in the light most favorable to the Commonwealth, as verdict winner, we conclude the record reflects there was ample evidence for the jury to conclude Appellant and "Duly" were acting in concert with a corrupt purpose because *all* of the relevant circumstances discussed in ***Lambert*** are present.

Initially, the record reflects Appellant and "Duly" had an association, and it is undisputed Appellant was present at the scene of the robbery. The video footage from the surveillance camera inside the Carolina Market shows Appellant and "Duly" conversing at length prior to Mr. Truesdale's arrival. Further, Mr. Truesdale testified Appellant referred to "Duly" as "my young bol."

N.T, 11/29/17, at 85. Moreover, Mr. Truesdale testified that, after the robbery, "Duly" said to Appellant, "Come on. We out. We out. We out." *Id.* at 90. The two men walked back into the Carolina Market within fifteen seconds of each other after the robbery, shook hands, and then walked away from the market together.

Moreover, there is ample evidence Appellant had "knowledge" that "Duly" would rob Mr. Truesdale, and he "participated" in the conspiracy. *Lambert*, 795 A.2d at 1016-17. Appellant, as opposed to "Duly," first approached Mr. Truesdale and asked him for money. Apparently unsatisfied with the $5.00 Mr. Truesdale gave to him, Appellant, as confirmed by the surveillance video footage, followed Mr. Truesdale out of the market, glanced at Mr. Truesdale as he crossed the street, and rifled through Mr. Truesdale's vehicle until Mr. Truesdale returned to stop him. Mr. Truesdale testified he did not give Appellant permission to search or look for anything inside of his vehicle. N.T., 11/29/17, at 120.

Appellant then rejoined "Duly" inside of the Carolina Market while Mr. Truesdale continued his conversation with a friend across the street. *Id.* at 122. When Mr. Truesdale returned to his vehicle, Appellant and "Duly" exited the market and approached the vehicle together. *Id.* at 123. Mr. Truesdale intended to drive away; however, as confirmed by the surveillance video footage and Mr. Truesdale's testimony, Appellant walked around to the

driver's side while "Duly" entered the front passenger side seat and pointed a gun at Mr. Truesdale. *Id.* at 123-24.

There is no evidence "Duly" asked Mr. Truesdale where he kept his money; but rather, "Duly" simply opened the center console and removed the cash. *Id.* Mr. Truesdale testified Appellant, who was his step-cousin, knew he kept cash in the center console. *Id.* at 87. Additionally, Mr. Truesdale testified when he asked Appellant, with whom he had a recent disagreement, why he was allowing "Duly" to take the money, Appellant said, "'F' you" to Mr. Truesdale. *Id.* at 124.

Based on this evidence, the jury could infer Appellant knew "Duly" was going to rob Mr. Truesdale. *See Lambert*, 795 A.2d at 1016-17. Further, the jury could infer Appellant participated in the robbery by advising "Duly" of where Mr. Truesdale kept his money, as well as approaching the vehicle on the driver's side while "Duly" committed the robbery. *See id.* As the trial court specifically noted, "even if there w[as] a flicker of doubt [about the existence of the conspiracy,] it would have been entirely snuffed out by the two men shaking hands—celebrating their enterprise—immediately after the robbery." Trial Court Opinion, filed 3/7/19, at 13.

Appellant contends he was "merely present" at the scene when the robbery occurred. However, as indicated *supra*, from the evidence presented, the jury could conclude Appellant and "Duly" were engaged in concerted activity with Appellant as an active participant, as opposed to a mere

bystander. Accordingly, the evidence is sufficient to support his conviction for criminal conspiracy.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/25/20